**CAMPANELLA et al., Appellees,**

v.

**COMMERCE EXCHANGE BANK, Appellant.**

[Cite as *Campanella v. Commerce Exchange Bank* (2000), 139 Ohio App.3d 796.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 76772.

Decided Sept. 19, 2000.

798

*Timothy N. Toma Co., L.P.A.,* and *Timothy N. Toma,* for appellees.

*Strachan, Green, Miller & Olender, William R. Strachan* and *Kirk W. Roessler,* for appellant.

---

James M. Porter, Judge.

Defendant-appellant Commerce Exchange Bank ("Commerce") appeals from a judgment following a jury trial in favor of plaintiffs-appellees Robert P. Campanella and his wholly owned company, Robert P. Campanella and Associates, in the amount of $24,530.66 plus prejudgment interest. Defendant Commerce contends the trial court erred in not granting its motions for summary judgment, a directed verdict or j.n.o.v. based on the doctrine of collateral estoppel. Defendant also contends that the verdict was against the manifest weight of the evidence and that the trial court erred in failing to properly instruct the jury and in awarding prejudgment interest. We reverse the judgment in part and affirm in part based on conditions.

This case arises from a claim by the Campanellas that Commerce is contractually liable for rent of premises on which a bankrupt corporation left certain equipment in which Commerce had a security interest. A detailed narration of the background facts is essential to understanding key issues at stake on this appeal.

From 1984 through 1991, Campanella owned a business known as U.S. Carbide Company ("Carbide–Campanella"). Carbide–Campanella operated its business in a 12,000 square foot building located on Brecksville Road in Independence, Ohio. The property was owned by Robert P. Campanella and Associates. Robert Campanella is Associates' president and chairman.

In 1991, Carbide–Campanella sold substantially all of its assets to U.S. Carbide Manufacturing Company, Inc. ("Carbide–Dawson"), a company owned by Steve Dawson. Commerce provided Carbide–Dawson with purchase-money financing in the form of a $230,000 loan, eighty percent of which was guaranteed by the Small Business Administration. To secure the loan, Carbide–Dawson granted to Commerce a first-lien security interest in substantially all of its assets, including its equipment.

Carbide–Campanella provided Carbide–Dawson with additional purchase-money financing by accepting a subordinated promissory note in the face amount of $80,000 ("Subordinated Note"). To secure the subordinated note, Carbide–Dawson also granted to Carbide–Campanella a security interest in substantially all of its assets, which was subordinate to Commerce's prior security interest. Financing statements were duly recorded with the Secretary of State showing Commerce's superior lien.

In connection with the purchase of the business, Carbide–Dawson, as tenant, and Associates, as landlord, entered into a written lease for the Brecksville Road property. Associates and Carbide–Dawson subsequently amended the lease by converting it from a fixed term to a month-to-month tenancy, with monthly rent of $4,000 payable on the first day of each calendar month.

On or about October 11, 1993, Carbide–Dawson informed Campanella that it had moved its business from the leased property. On October 22, 1993, Carbide–Dawson sent a letter to Associates attempting to terminate the lease effective October 15, 1993 and paid rent through September 30, 1993.

On October 20, 1993, Campanella met Dawson at the property and discovered that Carbide–Dawson had "trashed" the premises. Garbage was strewn throughout the building and five windows and two window frames were broken. Carbide–Dawson left behind some scrap-materials, office furniture and seventeen machine tools, the equipment collateralizing the SBA loan. Campanella demanded that Carbide–Dawson clean the premises and fix the broken windows, but this was not accomplished.

Later that day, Campanella telephoned C. Robert Green, an officer of Commerce, and informed him that Campanella intended to sell the equipment on the premises. Green reminded Campanella that Commerce's security interest in the equipment was prior to Campanella's security interest. Campanella claims that he told Green that if Commerce owned the equipment, then Commerce would have to rent the premises on which the equipment was situated. According to Campanella, Green told him that Commerce would not pay any rent to Associates, but would move the equipment as soon as possible. Green does not remember discussing rent with Campanella during their telephone conversation on October 20.

On October 28, 1993, Campanella met Green and Deborah Callen of the SBA at the premises. At this meeting, Campanella helped Green and Callen locate serial numbers and otherwise identify the equipment. Carbide–Campanella also had a security interest in the identical equipment, but subordinate to Commerce.

Campanella claims that Green asked him to secure the premises during their October 28 meeting, which Green denies. Green claims that Campanella asked "[s]hould I fix the windows and secure the property?" Green responded that fixing the windows sounded like a good idea. In any event, Campanella admits that Associates would have fixed the broken windows regardless of whether or not Green asked him to do so and regardless of whether or not the equipment remained upon the premises.

Campanella admits that Green never agreed to pay Campanella or his company rent in any amount. Campanella admits that he had no understanding or

agreement with Green concerning the payment of rent. Commerce and Associates never entered into any written lease or other agreement concerning the payment of rent or storage fees.

Associates never tendered possession of the premises to Commerce. Associates retained the keys to the premises and never gave Commerce independent access to the premises. Neither Green nor anyone else from Commerce returned to the premises after the October 28, 1993 meeting. Associates never billed Commerce for rent at any time while the equipment remained on the premises. Commerce never paid any rent and Associates never notified Commerce that it was delinquent in failing to pay rent.

At the October 28 meeting, Campanella "volunteered" to help Commerce sell the equipment. Campanella admits that Commerce never engaged him to assist in selling the equipment. However, Campanella claims that sometime in December 1993 or January 1994, Ms. Callen of the SBA told him to start keeping track of his time spent helping in finding a buyer so that he could be compensated. Callen denies asking Campanella to keep track of his time, but admits indicating to Campanella that she thought some type of compensation might be in order. Callen and Campanella agree that Callen never committed to paying any specific amount to Campanella. Bob Green of Commerce admitted that at the October 28 meeting he indicated to Campanella that he would be compensated for his assistance in procuring a buyer.

On November 3, 1993, only a few days after Green met Campanella at the premises, Carbide–Dawson filed a petition under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Ohio. Associates and Commerce both made filings therein to protect their interest as secured creditors.

On November 29, 1993, Associates filed a proof of claim with the Bankruptcy Court asserting a claim for $30,330 due from Carbide–Dawson for rent and repairs to the premises. Specifically, Associates claimed to be owed $12,000 for rent accruing since October 1, 1993. Associates also claimed to be owed several hundred dollars for fixing broken windows and lighting expenses at the premises.

In November 1993, Associates also began trying to locate a new tenant for the premises. Campanella contacted several realtors and told them that the premises were available. Sometime in January or February 1994, a representative of S & N Manufacturing, Inc. contacted Campanella and expressed an interest in leasing the premises. Associates subsequently gave S & N access to the premises on several occasions while the equipment remained on the premises. On or about April 1, 1994, Associates and S & N entered into a written lease covering the premises.

On November 23, 1993, Commerce filed with the Bankruptcy Court a motion for relief from the automatic stay requesting permission to take possession of and sell its collateral interest in the equipment. Carbide–Dawson and Commerce subsequently entered into an agreement in which Carbide–Dawson agreed to pay $3,000 per month as "adequate protection payments" against depletion of the bank's collateral and Carbide–Dawson also agreed it would not object to any disposal of the equipment. In accordance with Bankruptcy Rule 4001(d), Commerce and Carbide–Dawson submitted a joint motion seeking the Bankruptcy Court's approval of a stipulated order allowing Commerce to repossess the equipment.

In the meantime, Callen, of the SBA, had the equipment appraised and discovered that it had a liquidation value of $5,800. Callen then contacted some prospective buyers identified by Campanella. In late December 1993, Campanella, Callen and prospective buyers met at the premises to inspect the equipment.

The Bankruptcy Court approved the stipulated order on February 22, 1994 allowing Commerce to take possession of the equipment. Commerce sold the equipment for an aggregate price of $5,655. The buyers removed the equipment from the premises by the beginning of March 1994.

In late March 1994, Campanella wrote a letter to Callen claiming that Associates was due rent of $4,000 per month from October 1, 1993 through March 31, 1994 or $24,000. Campanella also claimed that he was due $2,100 for assisting with the sale of the equipment, calculated by multiplying the number of hours which he allegedly spent helping Callen by an hourly rate of $75. Prior to sending this letter, Campanella never discussed being compensated at the rate of $75 per hour with either Callen or Green.

Callen responded for the SBA that Campanella was entitled to no rent or storage fees. Nevertheless, Callen offered to pay Campanella fifteen percent of the proceeds received on the sale of the equipment, or roughly $900. Campanella rejected the SBA's offer and initiated litigation in the United States District Court for the Northern District of Ohio. On July 8, 1994, the Campanellas filed a six-count complaint in the district court (U.S.D.C. case No. 1:94CV1399) against Commerce, the SBA, and a machinery company, later dismissed.

The basic premise of plaintiffs' federal court action was that Commerce and the SBA should have paid Associates reasonable rent while Commerce's collateral remained upon Associates' premises, and that Commerce and the SBA should have paid Campanella for his time spent in helping dispose of Commerce's collateral. Specifically, the six counts asserted: (1) breach of an oral lease agreement with Associates; (2) breach of an oral contract with Campanella; (3) unjust enrichment or *quantum meruit;* (4) breach of fiduciary duty; (5) failure to dispose of collateral in a commercially reasonable manner; and (6) trespass.

Commerce and the SBA filed a joint motion for summary judgment on all counts. Prior to ruling on the summary judgment motion, the district court, upon a separate motion filed by the SBA, dismissed the breach of contract claims against both Commerce and the SBA on the grounds that plaintiffs failed to comply with the Contract Disputes Act of 1978, Section 601 *et seq.*, Title 41, U.S. Code which required the claims against the SBA to be brought in the Claims Court. Subsequently,the district court granted summary judgment in favor of Commerce and the SBA on plaintiffs' four remaining claims, including the *quantum meruit* claim.

In rejecting plaintiffs' unjust enrichment claim, the district court ruled that Commerce had no duty to pay Associates for storing the bank's collateral, and therefore, Commerce never received any benefit from Associates. Specifically, the district court held that a secured party's duty to care for collateral arises only upon the secured party taking actual possession of its collateral. The district court determined that Commerce never possessed nor controlled the collateral during the period of time for which Associates sought to recover rent.

On September 13, 1996, plaintiffs filed a notice of appeal to the United States Court of Appeals for the Sixth Circuit. The Sixth Circuit affirmed the district court's grant of summary judgment. *Campanella v. Commerce Exchange Bank* (C.A.6, 1998), 137 F.3d 885. The Sixth Circuit held that actual possession is required to give rise to a duty of care on the part of a secured creditor. *Id.* at 893. The Sixth Circuit confirmed that Commerce neither possessed, nor exercised any control over, the equipment located on Associates' premises, and that plaintiffs did not confer any benefit upon Commerce in storing the bank's collateral. *Id.* at 893–894.

The Sixth Circuit ruled, however, that although the district court lacked jurisdiction under the Contract Disputes Act regarding plaintiffs' contract claims against the SBA, that the District Court did have jurisdiction to consider plaintiffs' contract claims against Commerce and therefore found the district court improperly dismissed the claims pursuant to the Contract Disputes Act. *Id.* at 892–893. The Sixth Circuit remanded that portion of the case to the district court with instructions either to exercise its supplemental jurisdiction to review the claims against Commerce or dismiss the action. *Id.* at 893. The district court chose to dismiss the case.

Subsequently, on August 20, 1998, plaintiffs filed a two-count complaint against Commerce in the Common Pleas Court of Cuyahoga County, Ohio. Count One alleged that Commerce "expressly or impliedly contracted to lease" certain real property from Associates. Count Two alleged that Commerce expressly or impliedly contracted to retain Campanella to assist in selling certain of Commerce's collateral.

Commerce filed a motion for summary judgment on both counts. The trial court denied Commerce's motion without issuing an opinion.

The trial court conducted a jury trial from May 18, 1999 through May 20, 1999. At the close of plaintiffs' case, Commerce moved for a directed verdict, which the trial court denied. The jury returned a general verdict in favor of plaintiffs against Commerce in the amount of $24,530.66. Commerce subsequently filed a motion for judgment notwithstanding the verdict which the trial court denied. Thereafter, Commerce filed its timely notice of appeal to this court.

We find that Commerce's first assignment of error is dispositive of the appeal.

"I. The trial court erred in denying Commerce Exchange Bank's motion for summary judgment, directed verdict, and judgment notwithstanding the verdict."

■ Appellate review of summary judgments is de novo. *Grafton v. Ohio Edison Co.* (1996), 77 Ohio St.3d 102, 105, 671 N.E.2d 241, 244–245; *Zemcik v. LaPine Truck Sales & Equip.* (1998), 124 Ohio App.3d 581, 585, 706 N.E.2d 860, 863–864. The Ohio Supreme Court recently restated the appropriate test in *Zivich v. Mentor Soccer Club* (1998), 82 Ohio St.3d 367, 369–370, 696 N.E.2d 201, 204 as follows:

"Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. *Horton v. Harwick Chem. Corp.* (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292–293, 662 N.E.2d 264, 273–274."

Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). *Mootispaw v. Eckstein* (1996), 76 Ohio St.3d 383, 385, 667 N.E.2d 1197, 1199. Doubts must be resolved in favor of the nonmoving party. *Murphy v. Reynoldsburg* (1992), 65 Ohio St.3d 356, 358–359, 604 N.E.2d 138, 139–140.

■ It must be noted that the standards for reviewing a trial court's denial of a motion for summary judgment, a motion for directed verdict or a motion for judgment notwithstanding the verdict are identical. *Chemical Bank of New York v. Neman* (1990), 52 Ohio St.3d 204, 207, 556 N.E.2d 490, 493–494; *Youssef v.*

*Parr, Inc.* (1990), 69 Ohio App.3d 679, 688, 591 N.E.2d 762, 768. The appellate court must construe the evidence most strongly in favor of the non-moving party and must determine that reasonable minds could only conclude in the movant's favor. *Shepherd v. Westlake* (1991), 76 Ohio App.3d 3, 10, 600 N.E.2d 1095, 1099–1100; *Wiebold Studio, Inc. v. Old World Restorations, Inc.* (1985), 19 Ohio App.3d 246, 249, 19 OBR 398, 402, 484 N.E.2d 280, 285–286. The test is whether the movant is entitled to judgment as a matter of law. *Wiebold Studio,* 19 Ohio App.3d at 249, 19 OBR at 401–402, 484 N.E.2d at 285–286. Based on the foregoing authorities, we find that Commerce was entitled to judgment as a matter of law regarding plaintiffs' claims for breach of implied and expressed contract for non-payment of rent, but was not entitled to judgment as a matter of law regarding Campanella's brokerage fee.

We first address whether the evidence regarding the alleged agreement to pay rent presented an expressed contract, oral or written. A contract is created "where there is an offer by one side, acceptance on the part of the other, and a meeting of the minds as to the essential terms of the agreement." *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgt., Inc.* (1993), 87 Ohio App.3d 613, 620, 622 N.E.2d 1093, 1097–1098. A contract is not created unless the parties communicate to one another "a distinct and common intention" to create a binding obligation. *Id.*

A contract may either be express or implied-in-fact. *Columbus, Hocking Valley & Toledo Ry. Co. v. Gaffney* (1901), 65 Ohio St. 104, 61 N.E. 152. The distinction between "express" and "implied-in-fact" contracts is in the form of proof generally used to establish such contracts. *Id.* In express contracts, the parties' express written and oral statements manifest the offer and acceptance and the parties' meeting of the minds. *Stepp v. Freeman* (1997), 119 Ohio App.3d 68, 74, 694 N.E.2d 510, 514. In implied-in-fact contracts, the parties' meeting of the minds is shown by the surrounding circumstances including the parties' conduct and declarations, making it reasonably inferable that the parties intended to create binding and certain obligations. *Id.*

By Campanella's own admission, Commerce made no written or oral statements manifesting an intent to lease the premises from Associates. As Campanella explained during his deposition and during trial, Commerce never agreed to pay him and Commerce never admitted that it was a tenant in the building. Commerce refused to rent the premises and consistently maintained that it was not Associates' tenant. Clearly, the parties never communicated to one another a common intention to create a lease. Therefore, plaintiffs' breach of express lease claim in Count One fails as a matter of law.

■ We find that the doctrine of collateral estoppel precludes Associates from claiming that Commerce impliedly contracted to lease the premises. The general definition of collateral estoppel and its proper application were well stated recently by the Ohio Supreme Court in *Teachers Assn. v. State Emp. Relations Bd.* (1998), 81 Ohio St.3d 392, 395, 692 N.E.2d 140, 144:

■ "The doctrine of issue preclusion, also known as collateral estoppel, holds that a fact or a point that was actually and directly at issue in a previous action, and was passed upon and determined by a court of competent jurisdiction, may not be drawn into question in a subsequent action between the same parties or their privies, whether the cause of action in the two actions be identical or different. *Norwood v. McDonald* (1943), 142 Ohio St. 299, 27 O.O. 240, 52 N.E.2d 67, paragraph three of the syllabus; *Trautwein v. Sorgenfrei* (1979), 58 Ohio St.2d 493, 12 O.O.3d 403, 391 N.E.2d 326, syllabus; *Goodson v. McDonough Power Equip. Inc.* (1983), 2 Ohio St.3d 193, 2 OBR 732, 443 N.E.2d 978, paragraph one of the syllabus. While the merger and bar aspects of *res judicata* have the effect of precluding the relitigation of the same cause of action, the collateral estoppel aspect precludes the relitigation, in a second action, of an issue that has been actually and necessarily litigated and determined in a prior action that was based on a different cause of action. *Whitehead v. Gen. Tel. Co.* (1969), 20 Ohio St.2d 108, 112, 49 O.O.2d 435, 437–438, 254 N.E.2d 10, 13. 'In short, under the rule of collateral estoppel, even where the cause of action is different in a subsequent suit, a judgment in a prior suit may nevertheless affect the outcome of the second suit.' *Id.* at 112, 49 O.O.2d at 438, 254 N.E.2d at 13."

As indicated in their respective decisions, both the federal district court and the Sixth Circuit necessarily determined three issues which the trial court herein erroneously allowed plaintiffs to relitigate. First, both federal courts determined that Commerce did not own, possess or control the equipment at any time while it remained upon the premises. Second, they determined that Associates did not confer a benefit upon Commerce by allowing the equipment to remain on the premises. Third, they determined that Commerce acted promptly in obtaining relief from the automatic bankruptcy stay which the law imposed. Under the doctrine of collateral estoppel, these underlying determinations by the federal courts precluded Associates from relitigating the issue of whether Commerce impliedly contracted to lease the premises as set forth in plaintiffs' Count Two.

■ Even if we were to hold that collateral estoppel did not bar the plaintiffs' claims, we would nevertheless find that the same result obtains by reason of this Court's earlier decision in *Scott v. Ameritrust Co. Natl. Assn.* (May 29, 1986), Cuyahoga App. Nos. 50667 and 50668, unreported, 1986 WL 6124, which presents the identical legal issue. In *Scott,* the identical issue was presented: "The sole issue of this appeal is whether Ameritrust is liable to the appellants for the

alleged use of their premises based upon Ameritrust's security interest in goods and chattels located on the premises." This court's grant of summary judgment in favor of Ameritrust was affirmed. This court stated at 3–4:

"Appellants have provided no authority for their proposition that Ameritrust is liable to them for an alleged unlawful detention of their building because Ameritrust had the right to the chattels located therein. In our opinion, a right to possession is insufficient to hold Ameritrust liable for storage in its security interest in the goods and chattels. This duty arises only once a secured party is in possession of the goods. Under R.C. 1309.18, a secured party, once in possession of goods, acquires certain rights and duties in regard to the collateral. One such duty is to be responsible for all reasonable expenses incurred in the custody, preservation, use or operation of the collateral. Such an expense would include the payment of rent to store the collateral if necessary.

"In *One Greenstreet v. First National Bank* (Feb. 22, 1984), Montgomery App. No. 8192, unreported [19 Ohio App.3d 161, 19 OBR 267, 482 N.E.2d 1255], the court held that R.C. 1309.18 only applies when a creditor has actual possession of the security collateral. The court stated that where a creditor simply has a right to acquire possession, it did not believe that R.C. 1309.18 requires the creditor to avoid depreciation, one of its duties under R.C. 1309.18, in violation of its business judgment. Similar to *Greenstreet,* we are unwilling to state that R.C. 1309.18 imposes a duty to pay expenses related to the storage of collateral when a creditor has a mere possessory interest.

"R.C. 1309.36 provides further support for this Court's decision. R.C. 1309.36 states that '[t]he mere existence of a security interest or authority given to the debtor to dispose of or use collateral does not impose contract or tort liability upon the secured party for the debtor's acts or omissions.' Appellants are essentially seeking to extend their rental agreement with Diversified to have Ameritrust liable for the use of the premises because Ameritrust's security interest is located there. Under R.C. 1309.36, Ameritrust is not liable for any contract obligations that existed between Diversified and appellants."

█ Plaintiffs attempt to distinguish *Scott* by arguing that there was no evidence of an implied-in-fact lease as there was here. However, we do not find, as a matter of law, that a contract implied-in-fact ever existed. The party claiming that a contract exists must prove that the contracting parties reached a meeting of the minds as to the terms of the transaction. *Lucas v. Costantini* (1983), 13 Ohio App.3d 367, 368, 13 OBR 449, 449–451, 469 N.E.2d 927, 928–929. In implied-in-fact contracts, the parties' meeting of the minds is shown by the surrounding circumstances, including the parties' conduct and declarations, making it reasonably inferable that the parties intended to create a binding contract. *Stepp,* 119 Ohio App.3d at 73, 694 N.E.2d at 513–514.

The sole circumstance upon which Associates based its claim of an implied-in-fact lease is Campanella's belief that "[Commerce's] machines were in [Associates'] building." When plaintiffs' counsel asked Campanella what are the facts and circumstances upon which Associates bases the existence of an implied-in-fact lease, Campanella answered as follows:

"They occupied the building for 6 months with the machines. They prevented me from leasing the equipment or the building for 6 months and therefore, somebody owes me 6 months of rent and that is Commerce Exchange Bank. They occupied my building."

However, as stated above, both the district court and the Sixth Circuit previously determined that Commerce never occupied Associates' building. Those courts also concluded, as a matter of law, that Commerce never owned, possessed or exercised control over the equipment prior to the Bankruptcy Court granting Commerce relief from the automatic stay. *Campanella*, 137 F.3d at 893–894; *Campanella*, (D.Ct., N.D.Ohio 1996), Case No. 1: 94CV1399, at 17–19. Prior to February 22, 1994, the bankrupt's estate possessed the equipment and occupied the building. *Id.*

 Since the sole circumstance upon which Associates based the existence of an implied-in-fact contract is the presence of equipment in which Commerce had a security interest on the premises, Associates wrongfully attempts to relitigate the issue of whether or not the equipment "belonged" to Commerce. Thus, Associates' breach of implied lease claim fails as a matter of law. Without consideration, there can be no contract. *Carlisle v. T & R Excavating, Inc.* (1997), 123 Ohio App.3d 277, 283, 704 N.E.2d 39, 43. Under Ohio law, consideration consists of either a benefit to the promisor or a detriment to the promisee. *Id.* As the Sixth Circuit found in ruling on plaintiffs' *quantum meruit* claim, since Commerce did not possess the equipment, it had no duty to maintain it and therefore received no benefit from the plaintiffs maintaining the equipment on their property. *Campanella*, 137 F.3d 885 at 890.

 We also find that notwithstanding the collateral estoppel doctrine, no reasonable person could conclude that Commerce impliedly leased the premises from Associates. As noted above, a contract is created "where there is an offer by one side, acceptance on the part of the other, and a meeting of the minds as to the essential terms of the agreement." *McCarthy*, 87 Ohio App.3d at 620, 622 N.E.2d at 1097–1098. In implied-in-fact contracts, the parties' meeting of the minds is shown by the surrounding circumstances, including the parties' conduct and declarations, making it reasonably inferable that the parties intended to create binding and certain obligations. *Stepp*, 119 Ohio App.3d at 73, 694 N.E.2d at 513–514. The circumstances surrounding Commerce's repossession and sale of

the equipment, including the conduct and declarations of both Commerce and Associates, do not make it reasonably inferable that those parties intended to create a binding lease agreement.

Associates' conduct indicated that it never intended to lease the premises to Commerce. Associates never gave Commerce exclusive possession and control of the premises as it might to a lessee. *Campanella*, 137 F.3d at 888. Rather, Associates retained exclusive control as Commerce could not access the premises without Associates' permission and assistance. Associates provided that assistance on one occasion when Green visited the premises on October 28, 1993. Aside from that visit, nobody from Commerce accessed the premises. Exclusive possession is an essential element of any lease. *Cuvier Press Club v. Fourth & Race St. Assoc.* (1981), 1 Ohio App.3d 30, 34, 1 OBR 150, 154–155, 439 N.E.2d 443, 447–448. ("[t]he critical and the only indispensable elements of a lease of an interest in real property are the rights to exclusive possession of a certain quantity of land for a term certain").

Associates also never billed Commerce for rent during the alleged tenancy period. Likewise, Associates never notified Commerce that it was delinquent in paying rent at any time during the alleged tenancy period.

Associates also actively attempted to re-lease the premises to third parties during the alleged tenancy period. As early as November 1993, Associates asked various realtors to locate a new tenant. Associates presented no evidence at trial that Commerce somehow prevented Associates from re-leasing the premises. Associates' attempts to re-lease the premises indicate that Associates did not consider Commerce to be its tenant.

Associates demanded that Carbide–Dawson, not Commerce, clean the premises and fix the broken windows. When Carbide–Dawson failed to fix the windows as promised, Associates did the work itself. However, Associates charged the cost of those repairs to Carbide–Dawson, as evidenced by Associates' filing of a Proof of Claim with the Bankruptcy Court for $18,330 spent repairing the premises. Associates' actions contradict Campanella's claim that Commerce asked Associates to secure the premises. Such actions do not manifest an intent to lease the premises to Commerce, but instead manifest an intent to hold Carbide–Dawson liable under the terms of its lease with Associates.

Finally, Associates acted as though its lease with Carbide–Dawson was still in full force and effect. Specifically, Associates filed a proof of claim with the Bankruptcy Court claiming that Carbide–Dawson owed Associates $12,000 in rent. Since Carbide–Dawson paid rent through September 30, 1993, Associates' claim necessarily related to rent becoming due from and after October 1, 1993,

*i.e.*, the same period of time for which Associates sued in this action to recover rent from Commerce.

Based upon the foregoing conduct and declarations, no reasonable person could conclude that Commerce impliedly contracted to lease the premises from Associates. The trial court should have granted summary judgment, a directed verdict and j.n.o.v. on Count One.

 We do not find, however, that the trial court erred in denying Commerce's motion for summary judgment, directed verdict or j.n.o.v. regarding Campanella's claim for compensation in aiding Commerce in selling the equipment.

Campanella indicated that Deborah Callen of SBA, who was assisting Commerce in liquidating the equipment, had told him that he would be compensated for his help and to keep track of his time. (Tr. at 43). He thereafter kept track of his time and once the equipment was sold submitted a bill for $2,100 based on the rate of $75 per hour for twenty-eight hours. The record also indicates that both Deborah Callen and Bob Green of Commerce Bank did agree that Campanella should be compensated for his services. Deborah Callen stated at trial that she believed that Campanella was entitled to compensation, but did not know how much. She also acknowledged that she wrote an internal SBA memo in which she wrote "Bank recommends recruiting the assistance of the landlord in showing the goods to his contacts in the carbide industry." She also acknowledged that she thought 15% of the recovery price for the equipment was fair compensation for Campanella's assistance and, in fact, noted this in a letter dated April 18, 1994 in which she refused to pay the amount Campanella requested. Callen denied every telling Campanella to keep track of his hours. We find that there was sufficient evidence that Callen was working as an agent on behalf of Commerce as Bob Green testified that Callen was assisting Commerce in finding prospective buyers and liquidating the equipment.

Green testified that on October 28, 1993, when he met with Campanella to look at the abandoned equipment, he indicated to Campanella that Campanella would be entitled to compensation for his help in procuring a buyer. He thought that ten to fifteen percent of the recovery cost of the equipment was fair compensation as this is what an auctioneer would receive if the equipment were auctioned. Green also testified that Commerce deferred $1,000 per month for six months on a loan that Campanella had with the bank in exchange for his assistance.

 Therefore, based on the above evidence, there was sufficient evidence to find an agreement to pay Campanella. The amount he was to be compensated for, however, was in dispute. We do not find that this effects the existence of the contract as contended by Commerce. The Ohio Supreme Court in *Drexler v.*

*Labay* (1951), 155 Ohio St. 244, 44 O.O. 254, 98 N.E.2d 410, paragraphs two and three held:

"2. Ordinarily, where one person renders services at another's request and there is no express agreement relative to the payment therefore, the person rendering the services may recover for the reasonable value thereof.

"3. In such an instance, the trier of facts may fairly infer, as a matter of fact, that a contract existed between the parties under which one was to pay a reasonable amount for the services rendered by the other."

See, also, *Ellis v. Victor Elec. Prods., Inc.* (1949), 85 Ohio App. 170, 174, 40 O.O. 122, 123–124, 88 N.E.2d 275, 277 ("The fact that the exact amount of compensation is left to future determination between the parties does not destroy the obligation to pay the reasonable value of the services, even if partial payment is made from time to time, when such services are rendered under such an agreement"). We, therefore, find that the trial court did not err in denying Commerce's motion for summary judgment, directed verdict and j.n.o.v. as to Campanella's compensation claim for assisting in procuring a buyer for the equipment.

In affirming this portion of the judgment, however, we cannot determine what amount the jury awarded for rent and expenses and what portion was for Campanella's compensation as the jury awarded a lump sum of $24,530.66. However, we find that we can order a remittitur down to $2,100 as Campanella presented evidence to support his brokerage claim for this amount. This Court has the same power to order remittitur as does the trial court. *Chester Park Co. v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186, paragraph five of the syllabus; *Duracote Corp. v. Goodyear Tire & Rubber* (1983), 2 Ohio St.3d 160, 2 OBR 704, 443 N.E.2d 184; *Modic v. Modic* (1993), 91 Ohio App.3d 775, 786, 633 N.E.2d 1151, 1158–1159. It is not necessary that the excess to which the remittitur is addressed be susceptible to exact computation. *Schendel v. Bradford* (1922), 106 Ohio St. 387, 140 N.E. 155. However, the amount must be warranted by the evidence. *Burke v. Athens* (1997), 123 Ohio App.3d 98, 101, 703 N.E.2d 804, 805–806.

Therefore, this court reverses and vacates the judgment against defendant for the rent and expenses associated with keeping the equipment at plaintiffs' premises. We, however, affirm the award of damages as it relates to Campanella's claim for compensation in assisting in finding a buyer for the equipment. As to this part of the award, we remit the jury's award to $2,100 with interest at the statutory rate from the date of the original judgment. Plaintiff shall have ten days from the announcement of this decision to file an acceptance of this remittitur. If plaintiff refuses or fails to accept the remittitur within the time allotted, the judgment and award as applies to Campanella's claim for compensa-

tion is remanded to the trial court to ascertain the amount of damages to which Campanella is entitled, consistent with the principles enunciated in this opinion.

Accordingly, we find, as a matter of law, no express or implied contract obligating Commerce to reimburse Campanella for rent or repairs. However, we find the trial court did not err in denying Commerce's motion for summary judgment, directed verdict or j.n.o.v. as to plaintiffs' claim for brokerage fees in helping to find a buyer for the equipment.

Assignment of Error I is sustained in part.

"II. The trial court erred in refusing to give Commerce Exchange Bank's proposed jury instruction concerning the collateral estoppel doctrine.

"III. The trial court erred in refusing to give Commerce Exchange Bank's proposed jury instruction concerning the automatic bankruptcy stay imposed by 11 U.S.C. S362(a).

"IV. The trial court erred in refusing to give Commerce Exchange Bank's proposed jury instruction concerning the statute of frauds.

"V. The jury's verdict in favor of Robert P. Campanella and Robert P. Campanella & Associates, is against the manifest weight of the evidence.

"VI. The trial court erred in granting an award of pre–judgment interest to Robert P. Campanella and Robert P. Campanella & Associates from March 31, 1994."

Given our disposition of Assignment of Error I, we do not find it necessary to address Assignments of Error II through VI, which are moot. App.R. 12(A)(1)(c).

The judgment of the trial court is reversed in part and affirmed in part. Judgment for defendant-appellant Commerce Exchange Bank is hereby entered as to the plaintiffs' claims for rent and repairs. The judgment for plaintiff-appellee Campanella is affirmed as to the brokerage fee pursuant to the remittitur procedure and conditions aforesaid.

*Judgment reversed in part*
*and affirmed in part.*

JAMES D. SWEENEY, P.J., and BLACKMON, J., concur.