**BIG LOTS STORES, INC., Plaintiff,**

v.

**JAREDCO, INC., d.b.a., Goldman & Co., Defendant.**

No. C2–01–841.

United States District Court, S.D. Ohio, Eastern Division.

Jan. 30, 2002.

Joseph R. Miller, Vorys Sater Seymour & Pease, William Darrell Kloss, Jr., Bruce Leroy Ingram, Vorys Sater Seymour & Pease, Columbus, OH, for Plaintiff.

Ronald Benjamam Noga, Weltman Weinberg & Reis Co., LPA, Columbus, OH, Charles T. Hutchins, Goldman & Company, Secaucus, NJ, for Defendant.

### ORDER AND OPINION

MARBLEY, District Judge.

This matter is before the Court on cross-motions for summary judgment filed by Plaintiff on November 9, 2001, and by Defendant on November 30, 2001. The Court heard oral argument on January 2, 2002. For the following reasons, the Court **GRANTS** Plaintiff's motion and **DENIES** Defendant's motion.

### I. STATEMENT OF FACTS

Plaintiff Big Lots Stores ("Big Lots") is engaged in the business of general retail and wholesale services. Defendant Goldman & Co. ("Goldman") provides collection and recovery services for returned and uncollected checks, and also purchases such checks from payees. During July 2001, Big Lots and Goldman began negotiating for the potential sale by Big Lots to Goldman of approximately 34,000 uncollected checks with a face value of approximately $2,700,000. During negotiations, Defendant asked Plaintiff to provide Goldman with electronic files containing information concerning the checks, including identification of the payors. Defendant claimed that it needed the electronic file to evaluate whether it was interested in consummating the proposed transaction. Big

Lots required Goldman to agree that until a final sale agreement was reached and reduced to writing, Goldman could only use the data for purposes of evaluation, as the file contained all of the information necessary to begin collection efforts. Pursuant to Plaintiff's requirement, Big Lots and Goldman entered into a Confidentiality Agreement ("Agreement") on July 17, 2001. Only after the Confidentiality Agreement was executed did Big Lots provide the electronic file to Goldman.

The Agreement stated that Goldman was provided the file "solely for the purpose of evaluating the Transaction" and was not permitted to use the information contained therein "for any other purpose." The Agreement was equally clear regarding the necessity of a definitive sales agreement by stating that neither "an executed letter of intent or any other preliminary written agreement" nor "any written or oral acceptance of an offer or bid on either party's part" could create a binding sales contract for the electronic file. The Agreement required a "definitive executed agreement" before Defendant could use the information in the file for any purpose other than evaluating its interest in concluding the transaction. The Agreement further stated that "if the Transaction is not consummated by the parties or if [Big Lots] so requests, [Goldman] shall immediately return to [Big Lots] the Evaluation Material and all copies thereof."

Subject to the Agreement, Big Lots provided the electronic file to Goldman on or about July 24, 2001. Goldman verbally notified Big Lots on or about July 24, 2001, of its offer to purchase the checks for $110,000. After talking with Dreux Flaherty, former Director of Store Control for Big Lots, Goldman's President, Barry Sussman, prepared a formal written contract, entitled "Check Purchase Agreement" ("Purchase Agreement"), and faxed it to Tim Anderson, Vice President of Store Control for Big Lots, on July 27, 2001. Between July 25, 2001 and August 10, 2001, Goldman contacted Big Lots repeatedly to try to finalize the proposed Check Purchase Agreement. Big Lots did not respond. Mr. Sussman also exchanged e-mail communications with Big Lots representatives on July 27, 2001 to clarify whether the proposed purchase agreement was limited to Big Lots' customers or included customers of its affiliated companies.

In early August, Goldman began receiving telephone calls from Big Lots' former customers who were inquiring about how to settle dishonored checks they had written to Big Lots and its affiliated stores. These callers indicated that they had been instructed to call Goldman by Big Lots. On August 6, 2001, Mr. Sussman left a voice mail for Mr. Anderson expressing concern about this situation and indicating that it appeared Big Lots had agreed to the Check Purchase Agreement. Mr. Sussman received no response. On August 8, 2001, Wayne Kraus, Goldman's Marketing Representative, telephoned Mr. Anderson and left a similar voice mail message, but received no reply.

When the calls continued, Mr. Sussman telephoned Big Lots' general phone number on August 10, 2001, and discovered that Big Lots' recording was instructing payors who were calling about dishonored checks to contact one of three collection agencies, including Goldman. Goldman's counsel, Charles Hutchins, sent a letter to Mr. Anderson that day, stating that Big Lots' action in directing its payors to Goldman for payment of dishonored checks constituted acceptance of the Check Purchase Agreement, and that Goldman would commence check recovery efforts.

Despite all of these communications discussing the potential transaction, Big Lots never executed the Check Purchase

Agreement, nor was the transaction otherwise consummated. Notwithstanding the absence of a "definitive executed agreement," on August 10, 2001, Mr. Sussman instructed Goldman representatives to utilize the information in the electronic file to begin collecting the checks from the payors.

To collect the checks, Goldman representatives made numerous phone calls to Big Lots' customers, at least some of which were of questionable character. Recipients complained of being harassed, threatened with abusive language, and intimidated into paying large fees above the face amount of the check written. Karen Gilliam, for instance, stated in her affidavit that Goldman representative Mark Stevens told her that she owed $193.10 for her original $68.10 check, and threatened her with arrest if she did not pay. And Charlene Byrdsong testified that Goldman representative Bill Jenkins told her that she owed $224 for her original $99 check. Mr. Jenkins threatened her, saying: "You are going to jail if you don't have this money here to me by two o'clock." After she told him that the check had been paid, he yelled: "You're lying. You're going to jail."

On August 20, 2001, Big Lots learned of Goldman's actions when it began receiving complaints from upset customers who had been contacted by Goldman. On August 21, 2001, Big Lots received Goldman's August 10, 2001 letter. That day, Plaintiff demanded that Defendant cease its collection efforts and return the electronic file. Goldman refused to return the data and continued to contact Big Lots' customers.

## II.  PROCEDURAL HISTORY

On August 24, 2001, Plaintiff filed a Complaint alleging breach of contract and conversion, and requested a Temporary Restraining Order from the Franklin County Court of Common Pleas, which was granted the same day by Judge Cain. The state court's order enjoined Goldman from any further collection efforts relating to the electronic file, from initiating any communications with consumers whose information and checks were provided by Big Lots, and from making any copies of the file. Defendant was also required to refer immediately any and all inquiries by consumers listed in the electronic file to a telephone number supplied by Big Lots.

Defendant removed this matter to this Court on September 4, 2001, and on September 12, 2001, this Court extended the Temporary Restraining Order under FED. R.CIV.P. 65(b) until September 21, 2001.[1] On September 24, the Court issued an oral Preliminary Injunction and subsequently issued a written opinion on November 1, 2001. On September 28, 2001, the Court found Goldman in contempt and fined it $20,000 based upon evidence adduced at the Preliminary Injunction hearing that Goldman continued collection efforts throughout August and September 2001 from persons listed in the file in violation of the Temporary Restraining Order. At a subsequent damages hearing held on November 28, 2001, the Court ordered Goldman to file with the Court an insured bond, or open an escrow account, in the amount of $153,986.05, and to pay attorney fees in the amount of $12,595 made payable to Big Lots. As of January 28, 2002, Defendant had failed to file the required bond or to pay Plaintiff's attorney fees.

## III.  STANDARD OF REVIEW

In evaluating cross-motions for summary judgment, courts should " 'evaluate each motion on its own merits and view all facts and inferences in the light more fa-

---

1.  The Court subsequently extended the Temporary Restraining Order until the conclusion of the Preliminary Injunction hearing on September 24, 2001.

648

vorable to the nonmoving party.' " *Bakery & Confectionary Union & Indus. Int'l Health Benefits & Pension Funds v. New Bakery Co. of Ohio,* 133 F.3d 955, 958 (6th Cir.1998) (quoting *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir.1994)). Significantly, a case is not necessarily appropriate for resolution at summary judgment simply because both parties have moved for summary judgment. *B.F. Goodrich Co. v. U.S. Filter Corp.,* 245 F.3d 587, 593 (6th Cir.2001). "The filing of cross-motions for summary judgment does not necessarily mean that the parties consent to resolution of the case on the existing record or that the district court is free to treat the case as if it was submitted for final resolution on a stipulated record." *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991) (citing *John v. State of La. (Bd. of Trustees for State Colleges & Univs.),* 757 F.2d 698, 705 (5th Cir.1985)).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed only by one party to the litigation. *Taft Broad.,* 929 F.2d at 248. Summary judgment is therefore appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e); *see Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Searcy v. City of Dayton,* 38 F.3d 282, 286 (6th Cir.1994). The nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.,* 8 F.3d 335, 339–40 (6th Cir.1993). Furthermore, the mere existence of a scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury could reasonably find for the nonmoving party. *Anderson,* 477 U.S. at 251, 106 S.Ct. 2505; *see Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).

## IV. ANALYSIS

### A. Plaintiff's Breach of Contract Claim

Plaintiff argues that Defendant breached the Confidentiality Agreement by collecting on the electronic file without Big Lots' approval. Big Lots claims that Goldman wilfully violated the Agreement's terms and conditions by using the file to

collect aggressively from customers listed in the file through threats, harassment, and intimidation in violation of the only contract between the parties. Plaintiff further contends that Defendant breached its contract with Big Lots by refusing to return the electronic file, since the Agreement states that, upon request, Goldman is required to "immediately return to [Big Lots] the Evaluation Material and all copies thereof." Big Lots claims that it has repeatedly demanded the return of the information but Goldman has unlawfully refused.

Goldman argues that an implied-in-fact contract came into existence between the parties due to Plaintiff's actions that superseded the Confidentiality Agreement and entitles Goldman to judgment as a matter of law. As evidence of such an implied-in-fact contract, Defendant first points out that a voice mail message at Big Lots referred payors to Goldman through Goldman's 1–800 number. Defendant claims that this marketing number has always been exclusively for use by Goldman to call clients, and for clients (not their customers) to call Goldman. Goldman believes that this recorded greeting constitutes performance on the proposed Purchase Agreement. In the absence of such an implied-in-fact contract, Defendant asserts that Big Lots cannot explain why this message continued to refer Big Lots customers to Goldman after the parties had terminated their previous business relationship, or why a flood of calls to Goldman commenced within days of Goldman's transmission of the $110,000 Purchase Agreement. Goldman contends that Big Lots would not have referred hundreds of its former customers had it not intended to be contractually bound. Goldman further argues that its reliance on Big Lots' actions indicating acceptance was reasonable given: (1) the parties' prior history of doing business; (2) that Big Lots did not request bids from other collection agen-

cies; (3) that Big Lots did not respond to the phone calls from Sussman and Krause about the customers' phone calls; and (4) that Big Lots did not respond to Hutchins' August 10, 2001 letter for eleven days.

■ The Court finds that Defendant clearly used the electronic file to contact and collect from consumers, and that Goldman's improper use of this data is a breach of the Confidentiality Agreement. Ohio "law is clear that to constitute a valid contract, there must be meeting of the minds of the parties, and there must be an offer on the one side and an acceptance on the other." *Noroski v. Fallet*, 2 Ohio St.3d 77, 442 N.E.2d 1302, 1304 (1982). Contracts may either be express or implied-in-fact. *Columbus, Hocking Valley & Toledo Ry. Co. v. Gaffney*, 65 Ohio St. 104, 61 N.E. 152, 153 (1901). In express contracts, "the parties' express written and oral statements manifest the offer and acceptance and the parties' meeting of the minds." *Campanella v. Commerce Exchange Bank*, 139 Ohio App.3d 796, 745 N.E.2d 1087, 1095 (2000) (citation omitted). Under Ohio law, the Court must enforce a contract whose terms are clear and unambiguous. *See, e.g., E.S. Preston Associates, Inc., d.b.a. ESPA v. Preston*, 24 Ohio St.3d 7, 492 N.E.2d 441, 445 (1986) ("Where the terms of a contract are clear and unambiguous, this court cannot find a different intent from that expressed in the contract.") (citation omitted). An implied-in-fact contract is one that involves no express agreement, but the meeting of the minds is proven by the surrounding circumstances that make it inferable that the contract exists as a matter of tacit understanding. *State ex rel. Mallory v. Pub. Emp. Retirement Bd.*, 82 Ohio St.3d 235, 694 N.E.2d 1356, 1367 (1998). Such a contract "has the same legal effect as an express contract, the only difference being the manner of manifesting assent." *Gar-*

*gasz v. Nordson Corp.,* 68 Ohio App.3d 149, 587 N.E.2d 475, 478 (1991). Express and implied-in-fact contracts differ "in the form of proof generally used to establish such contracts." *Campanella,* 745 N.E.2d at 1095 (citation omitted).

The parties agree that the Confidentiality Agreement was a properly formed binding contract. Under the terms of the Agreement, Goldman was to use the electronic file "solely for the purposes of evaluating the Transaction" and was not permitted to "use, or allow the use by any of its Representatives . . . any portion of the Evaluation Materials for any other purpose." Furthermore, Defendant had "*no* rights in the Information, Evaluation Material or any other document, data, or negotiable instrument (including any electronic file or representation thereof)" until a written sales agreement was executed. Thus, to supersede the Confidentiality Agreement, any contract for the purchase of the checks and collection thereunder had to be in writing.

Defendant has presented no evidence of any written contract that superseded the Agreement. Indeed, there was no written contract executed by and between the parties except the Confidentiality Agreement. On or about July 27, 2001, Barry Sussman submitted a proposed contract to Big Lots to purchase the checks for $110,000. Tim Anderson told Mr. Sussman that Big Lots was not ready to accept Goldman's offer, but would evaluate the proposal. Plaintiff never signed Defendant's proposal, nor did Big Lots ever communicate to Goldman that it intended to execute the proposal. Defendant's claim that Dreux Flaherty made statements to Goldman indicating that Big Lots had accepted the proposal is unsupported by the record. Ms. Flaherty's deposition does not support the allegation that she indicated that there had been any acceptance of the written offer that was submitted by Mr. Sussman to Big Lots.

Goldman's implied-in-fact contract argument rests almost entirely on Joyce Oakley's phone greeting, which allegedly referred payors to Goldman. Yet, the uncontroverted evidence in this case is that Ms. Oakley, a Big Lots clerk who dealt with returned checks, had a phone greeting dating back approximately a year and a half to when Goldman previously collected debts on behalf of Big Lots. The Oakley recording predated both the Confidentiality Agreement and Goldman's proposal. The recording mentioned Goldman as one of three collection agencies that customers might call regarding their delinquent checks. Ms. Oakley testified that her voice mail message had nothing to do with the proposed transaction or the checks contained in the electronic file transferred to Goldman pursuant to the Confidentiality Agreement. Ms. Oakley further testified that, beginning on August 20, 2001, Big Lots was inundated with calls from customers whom Goldman had contacted and harassed in its collection efforts. Ms. Oakley's old voice mail message was changed on or about August 21, 2001, as soon as Big Lots became aware that payors might be contacting Goldman as a result of this old phone greeting.

Defendant's contention that Ms. Oakley's voice mail message amounted to Plaintiff's acceptance of the Purchase Agreement by performance is without merit. The Court is perplexed as to why Big Lots would intimate acceptance of the proposed transaction through a telephone recording made for the public, but would otherwise refuse to return Goldman's calls inquiring about the transaction. Moreover, the Court cannot understand why Big Lots would attempt to accept the proposed transaction by posting the old 1–800

number that Goldman used for marketing, instead of the current telephone number used by Defendant for collection. All of the available evidence indicates that Ms. Oakley's voice mail message was recorded more than a year prior to the creation of the Confidentiality Agreement. The message, therefore, could not have been created with the intention of accepting Goldman's proposed Purchase Agreement.

Furthermore, Big Lots' failure to respond to Goldman's offer did not create an implied-in-fact contract. While Defendant placed numerous calls attempting to convince Plaintiff to accept the offer, Goldman's contacts went largely unanswered. Mr. Anderson tried to avoid responding to Mr. Sussman's inquiries because Anderson had not determined whether Goldman's proposal was in Big Lots' best interest. At no time did Mr. Anderson, or anyone else at Big Lots, give any indication that Goldman's offer had been accepted.

Indeed, Mr. Sussman stated in his deposition, "it is now obviously apparent that [collection] is not what Big Lots perhaps intended, but at the time it seemed to me that it was wholly reasonable to assume that some sort of an agreement had been made that someone there was intending to use Goldman." It is difficult to understand why Goldman would engage in contractual activity when Big Lots would not even return its phone calls to indicate acceptance of the offer. Goldman's collection efforts were based on a mere supposition, rather than a manifestation of intent or any affirmative act by Big Lots. Based on this evidence, there was no implied-in-fact contract for the purchase of the checks. The only contract that existed between the parties was the Confidentiality Agreement, which stated in unequivocal terms that no contract for the sale of the checks could be consummated unless it was in writing. There was never such a written agreement. Thus, by using the electronic file for purposes other than evaluation, Defendant breached the Agreement.

The Court, therefore, **GRANTS** Plaintiff's motion for summary judgment and **DENIES** Defendant's motion as to Plaintiff's breach of contract claim.

### B. Plaintiff's Conversion Claim

Plaintiff argues that it is entitled to summary judgment as to Goldman's liability for Big Lots' claim of conversion. Big Lots claims that the undisputed facts establish that Goldman wrongfully converted Big Lots' property for its own improper use and has refused to surrender the information in contravention of Big Lots' lawful right to possession. Defendant does not address Plaintiff's conversion claim directly. Rather, Goldman argues that an implied-in-fact contract existed for the sale of the checks that superseded the Confidentiality Agreement. If such a Purchase Agreement was consummated, Goldman appears to claim implicitly that it had a right to the checks that would render Plaintiff's conversion claim moot.

Conversion is the wrongful exercise of dominion over property. *Blon v. Bank One, Akron, N.A.*, 35 Ohio St.3d 98, 519 N.E.2d 363, 369 (1988). Defendant refused to return the electronic file to Plaintiff when requested, although the Agreement stated that if "the Transaction is not consummated by the parties or if [Big Lots] so requests, [Goldman] shall immediately return to [Big Lots] the Evaluation Material and all copies thereof." The Agreement made clear that Goldman acquired no property right to the electronic file until a definite agreement was reached and reduced to writing. Defendant's withholding the information contravenes Plaintiff's lawful right to possession, and its actions are, therefore, conversion as a matter of law. *See Heidtman Steel Products, Inc. v. Compuware Corporation,*

2000 WL 621144, at *15–16 (N.D.Ohio February 15, 2000).

Thus, the Court **GRANTS** Plaintiff's motion for summary judgment and **DENIES** Defendant's motion as to Plaintiff's conversion claim.

### C. Defendant's Claim of Plaintiff's Unclean Hands

Defendant argues that Plaintiff engaged in a scheme to defraud Goldman and that, based on its actions, Big Lots has "unclean hands" which prevent Plaintiff from recovering damages or receiving equitable relief. First, Goldman alleges that Big Lots attempted to induce Goldman to begin performance on the proposed Purchase Agreement by referring Big Lots customers to Goldman, by refusing to answer Goldman's inquiries, and by waiting eleven days after Hutchins mailed his "acceptance by performance" letter before responding. As evidence of this deception, Goldman cites an August 21, 2001 phone call from Mr. Anderson to Mr. Sussman and Mr. Hutchins. During the call, which Goldman apparently taped, Mr. Anderson denied receipt of Mr. Hutchins' letter until August 21, while somebody else in the background (believed to be Big Lots in-house counsel Chad Reynolds) could be overheard twice telling Anderson "sent on the 10th ... sent on the 10th." Defendant claims that Big Lots sold hundreds of checks to Goldman that could not be collected on, and which were to be excluded from the batch of checks Goldman had offered to buy. Furthermore, Defendant alleges that Big Lots and its counsel acted wrongfully and deceitfully in getting the Temporary Restraining Order, in preparing false affidavits, and in exchanging friendly affidavits for debt forgiveness.

■ Goldman's affirmative defense of Plaintiff's unclean hands is without merit and does not require that the Court grant Defendant's motion for summary judgment. The doctrine of unclean hands is "a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant." *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation" of the unclean hands doctrine. *Id.* at 815, 65 S.Ct. 993. As the Sixth Circuit has stated, "fraud or unclean hands are not to be lightly inferred. They must be established by clear, unequivocal and convincing evidence." *Kearney & Trecker Corp. v. Cincinnati Milacron Inc.*, 562 F.2d 365, 371 (6th Cir.1977). In the matter *sub judice*, Goldman has not presented unequivocal and convincing evidence that Big Lots engaged in fraudulent, deceptive, and bad faith conduct. Each such allegation made by Goldman is disputed by Big Lots and susceptible to more innocuous explanations.

First, there is no evidence that Tim Anderson lied about the date on which he received Charles Hutchins' letter. At the Preliminary Injunction hearing, U.S. postal employee Sue Heffner testified that the August 10, 2001 letter was not processed by the New Jersey post office until approximately August 14, 2001, and likely did not arrive in Columbus until Saturday, August 18, 2001. Ms. Heffner's testimony established that Mr. Anderson probably did not receive the letter before Monday, August 20, 2001, and could very well have first seen it on August 21, as he claims.

Second, Big Lots never made any representation or warranty that the electronic file would not contain problem checks. In fact, the Confidentiality Agreement expressly disclaimed any warranty to that

effect. Despite Goldman's contention, there is no other evidence of record that Plaintiff used fraud—or any other artifice—to induce Defendant to commence collection on the checks. The Confidentiality Agreement, Plaintiff's demands that Defendant return the electronic file, and Big Lots' refusal to accept payment from Goldman, all belie this allegation.

Third, there is no evidence to suggest that Plaintiff's counsel acted wrongfully and deceitfully in obtaining the Temporary Restraining Order, that they prepared false affidavits, or that they exchanged debt forgiveness for friendly affidavits. Sheila Lung, for example, told Big Lots that a Goldman collector had threatened to break her knee-caps. She also memorialized the conversation in writing and sent her record to Big Lots, which was then used by Plaintiff's counsel in seeking the Temporary Restraining Order. Nothing in the record suggests that Plaintiff's counsel had any reason to doubt the veracity of Ms. Lung's statements. Although he could not remember the exact words used, Edward Banks testified in his deposition that a Goldman collector had used profanity when talking to him. And there is no evidence of any *quid pro quo,* as all of the Big Lots customers deposed denied that they had given affidavits in exchange for debt forgiveness.

Finally, the Court has indicated previously that it deems Goldman's unclean hands defense as relevant only to damages in this case and not to the merits of Big Lots' breach of contract and conversion claims.[2] These allegations need not even

be considered in the context of the cross-motions for summary judgment.

The Court, therefore, **DENIES** Defendant's motion for summary judgment as to its unclean hands defense.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiff's Motion for Summary Judgment in its entirety, and **DENIES** Defendant's cross motion for summary judgment in its entirety.[3]

**IT IS SO ORDERED.**

---

**2.** *See* October 24, 2001 Telephonic Status Conference at pp. 13–14. The Court: "Here is my concern, Mr. Hutchins-this is a breach of contract case. The issue is whether Goldman ... breached a contract with Big Lots. This issue of suborning perjury [unclean hands defense] in the Court's view seems to be tangential to the central issue in this case,

and at most it goes to the issue of damages. It doesn't go to the issue of breach."

**3.** As the Court's Order and Opinion only addresses issues of liability, the scheduled trial of this matter will be limited to any damages that Plaintiff may have sustained.