DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Toledo Municipal Court awarding plaintiff-appellee, Ed Burgin, $13,500 for heating systems he installed in four newly constructed homes. The court found that defendants-appellants, DJT, Inc. and Duane J. Tillimon, were solely responsible for the payment of that award. Therefore, the trial court also found in favor of defendant-appellee, Michael Madden, on his motion to dismiss Burgin's claim against him for those same monies. In addition, the court determined that appellants owed Madden $10,500 on his cross-claim against DJT, Inc. and Duane J. Tillimon for the duties Madden performed as the construction supervisor. Finally, the municipal court found in favor of Madden on appellants' cross-claim for damages in the amount of $14,474.84 that resulted from alleged overruns in construction costs and costs incurred due to delays in the sale of the new houses.
Appellants appeal the trial court's judgment and assert the following assignment of error:
 "Both as to liability and as to the liability of Duane J. Tillimon, the judgment is against the manifest weight of the evidence."
On April 18, 1997, DJT, Inc. obtained financing, in the amount of $203,000, from National City Bank for the construction of four new houses in Byrne-Hill Estates. Duane J. Tillimon was the guarantor of the loan. The disbursing agreement named DJT, Inc. the general contractor of the project.
On April 30, 1997, Duane J. Tillimon, DJT, Inc., Thomas B. Crawford and Michael Pantanella, d.b.a. as Panford Homes ("Panford"), Michael Madden, d.b.a. Michael's Construction ("Madden"), and Equity Preservation, Inc. ("Equity"), entered into a contract for the construction and sale of houses (Contract I"). The original intent of the parties was to construct twenty homes in the Byrne-Hill Estates subdivision. Pursuant to the terms of Contract I, Panford was designated as the general contractor for and seller of the houses, Madden was the construction supervisor, Equity was the real estate broker, Duane J. Tillimon was to obtain financing of the project, and DJT, Inc. was to pay construction related expenses of up to $46,000 per house.
Contract I stated that DJI, Inc., was responsible for the payment of monies owed to the individual subcontractors. It added, however, that DJT, Inc. was acting solely as a "paymaster" for Panford and would not be "personally liable for payment of labor, material, commissions, or financing expenses to anyone." The contract expressly stated that Panford "shall have a separate agreement with Madden regarding the construction of the homes." It was signed by Duane J. Tillimon, Duane J. Tillimon as President of DJT, Inc., Duane J. Tillimon as President of Equity, Crawford and Pantanella as officers of Panford, and Michael Madden.
Madden and Panford entered into a separate home construction contract ("Contract II") for the building of four houses at Byrne-Hill Estates on May 6, 1997. Contract II set forth subcontractors' estimates for the costs of the different aspects, e.g., electrical work, of building the houses with a total of $46,000 per house. This amount included Madden's $6,000 per house fee for construction supervision. Contract II also specified that Madden would construct the four homes for Panford "in accordance with the plans and specifications submitted to National City Bank." These plans and specifications contained added costs for labor and/or materials that were not listed in Contract II.
On May 24, 1997, Duane J. Tillimon, in his individual capacity, sent a letter to Panford and Madden indicating that he no longer wished to participate in the building of any additional homes beyond the four already under construction under the April 30, 1997 contract. He claimed that there was no "meeting of the minds" in interpreting Contract I.
On May 29, 1997, Tillimon, again in his individual capacity, "terminated" Contract I between Duane J. Tillimon, DJT, Inc., Equity and Panford. In the letter sent to Panford, Tillimon stated that there was no meeting of the minds between the parties. The letter indicated that Tillimon was allowing Madden and the various subcontractors hired by Madden for Panford to complete the four houses. Panford, while indicating that the action by Tillimon constituted a breach of contract, withdrew from the project.
According to Tillimon, he believed that he and Madden reached a verbal agreement under which Michael's Construction would finish the project pursuant to the Panford/Madden contract. Madden testified, nonetheless, that his position as construction supervisor was unchanged.
In paying the subcontractors for their work, Madden would submit the subcontractor's invoice to Tillimon for each construction expense, and Tillimon, acting as President of DJT, Inc. would issue a check to Madden for the amount or amounts needed to pay the expense or expenses. At times, DJT, Inc. would issue a single check to Madden for the payment of more than one expense; therefore, Madden would be responsible for the payment of the individual subcontractors.
It is undisputed that, before May 29, 1997, Burgin was subcontracted to install a heating system in each of the new houses at a cost of $3,600 each. He was paid $900 in May 1997, but never received any further payment after he completed installing the heating systems on October 14, 1997. Burgin believed that Madden's position was "superintendent" of the project and that DJT, Inc. controlled the finances. He therefore sent his final bill to that entity.
It is also undisputed that the $46,000 allotted for the construction of each house was disbursed by DJT/Tillimon. According to Michael Madden, however, the final amount that he received from Tillimon was insufficient to pay the $13,500 owed to Burgin and the $10,500 owed to Madden in his capacity as the construction supervisor. In addition, there was no money available to pay another subcontractor, Jennite Company.
Michael Madden attributed the deficiency to the cost of the upgrades requested by Tillimon. For example, Madden indicated that the original Madden/Panford quote for the electrical work for all four houses was $7,200. But, according to Madden, due to "extras" requested by Tillimon, the actual amount expended was $15,646. Tillimon, on the other hand, asserted that all of the alleged upgrades were part of the plans and specifications submitted to National City Bank in the loan process as incorporated into the contract between Madden and Panford. Therefore, Tillimon concluded, in essence, that Madden was required to construct the four houses with these extras or upgrades and stay within the stated limit of $46,000 per house.
Because he never received the final payment, Burgin initiated the instant action, naming Duane J. Tillimon; DJT, Inc.; Crawford and his spouse and Pantanella, d.b.a. Panford; and Michael Madden, d.b.a. Michael's Construction as defendants. Madden filed his cross-claim against DJT, Inc., and Duane J. Tillimon and DJT, Inc. filed its cross-claim against Madden. The Crawfords and Pantanella, d.b.a. Panford Homes, were later dismissed from these proceedings.
In this appeal, appellants challenge specified findings made by the trial court, arguing that they are against the manifest weight of the evidence.
Judgments supported by some competent, credible evidence going to all essential elements of a cause shall not be reversed on appeal as being against the manifest weight of the evidence. C.E. Morris Co. v. FoleyConstr. Co. (1978), 54 Ohio St.2d 279, 279. Additionally, we must give deference to the findings of the trial court, recognizing that the trial judge is in the best position to "view witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." Seasons Coal Co.,Inc. v. Cleveland (1984), 10 Ohio St.3d 77, 80.
In the present case, the court found that Burgin submitted an invoice to Tillimon for partial payment and received $900. Appellants assert that the evidence shows that Burgin submitted the invoice to Madden and that Madden issued the check to Burgin. Appellants ignore the fact that, by their own admission, DJT, Inc. paid all of the construction costs through a process that involved Madden as an intermediary. Consequently, no prejudicial error arises from the disputed finding.
We do, nevertheless, agree with appellants in claiming that the municipal court erred in finding Duane J. Tillimon, in his personal capacity, jointly and severally liable for the $13,500 owed to Burgin. The only connection between Burgin and Tillimon occurred when Tillimon was acting in his corporate capacity. Specifically, checks issued for the payment of subcontractors were corporate checks naming Duane J. Tillimon as President and signed by Tillimon directly under that title. It is clear, due to the form of the transaction and the form of the signature, that only DJT, Inc. is liable for the monies owed to Burgin. See Gund Business Enterprises v. Duffet (July 22, 1999), Cuyahoga App. No. 76019.
We next turn to Madden's cross-claim for the $10,500 owed for the performance of his supervisory duties. Appellants contend that the trial court erred in finding that Contract I was no longer in effect. Although appellants do not expressly argue that Contract II was still binding on the parties, they rely on that agreement to argue that all alleged "extras" were part of the $46,000 contract price. Because DJT, Inc. disbursed that full contract price, appellants assume that no funds are owed to Madden. Thus, our first task is to determine whether some type of contract for the construction of four houses for a cost of $46,000 existed between Madden and DJT, Inc. and/or Duane J. Tillimon.
A contract is created "where there is an offer by one side, acceptance on the part of the other, and a meeting of the minds as to the essential terms of the agreement." McCarthy, Lebit, Crystal Haiman Co., L.P.A.v. First Union Mgt., Inc. (1993), 87 Ohio App.3d 613, 620. Courts recognize three types of contracts: express, implied in fact, and implied in law. Legros v. Tarr (1989), 44 Ohio St.3d 1, 6, citing Hummel v.Hummel (1938), 133 Ohio St. 520, 525. In an express contract, the parties assent to the terms as actually expressed through the offer and acceptance. Id. In a contract implied in fact, the meeting of the minds is shown by the surrounding circumstances that demonstrate that a contract exists as a matter of tacit understanding. Id. In contracts implied in law, civil liability attaches by operation of the law upon a person who receives benefits that he is not entitled to retain. Id. Contracts implied in law are not true contracts, but are quasi-contracts imposed by courts to prevent unjust enrichment. Id.
Here, Contract I was unilaterally terminated by Tillimon. Neither DJT, Inc. nor Duane J. Tillimon was a party to Contract II. Thus, the parties to this appeal did not operate under either of the express written contracts. Consequently, the trial court's finding as to the original contract is not against the manifest weight of the evidence.
The key issue to be decided, therefore, is whether either an oral express contract or an implied in fact contract governed the relationship between Madden and DJT, Inc. and/or Duane J. Tillimon.
The evidence offered at trial revealed that Tillimon offered to allow Madden to continue in his supervisory capacity over the construction project with Madden, rather than Panford, submitting invoices to DJT, Inc. for payment. Both parties agree that Madden accepted this offer and that they agreed that the estimates for construction labor and materials would govern the cap, $46,000, for construction costs. Nonetheless, the evidence, as set forth above, also established that there was no meeting of the minds as to an essential term of the contract, that is, whether the provision of Contract II incorporating the plans and specifications submitted to National City Bank were part of that contract. Moreover, we have no inkling as to the parties to this alleged contract. Apparently, Duane J. Tillimon made the offer but DJT, Inc. satisfied the monetary obligations resulting from that offer. For these reasons, we conclude that no express oral contract existed between Madden and Duane J. Tillimon and/or DJT, Inc.
As to a contract implied in fact, the party claiming that a contract exists must demonstrate that the parties reached a meeting of the minds as to the terms of the transaction. Campanella v. Commerce Exch. Bank
(2000), 139 Ohio App.3d 796, 808. citing Lucas v. Costantini (1983),13 Ohio App.3d 367, 368. Again, in viewing the circumstances surrounding the transaction in the present case, there is a dearth of competent, credible evidence supporting a meeting of the minds as to terms of an alleged agreement between Madden and Duane J. Tillimon and/or DJT, Inc.
Madden believed that the $46,000 was the limit of construction costs based only upon the written estimates of the various contractors and that anything else requested by Tillimon was an "extra." Tillimon believed that specifications cited in the plans submitted to National City Bank also controlled the construction of the four homes and that their cost was included in the $46,000. Thus, there was no agreement as to terms, and no implied in fact contract existed between these parties. As a result, Madden could not recover the cost of the services he provided as construction supervisor based upon a contractual theory.
Nevertheless, Madden's cross-complaint sets forth a claim for unjust enrichment. Three elements must be proved for a successful claim of unjust enrichment. There must be: "(1) [a] benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment."Hambleton v. R.G. Barry Corp. (1984), 12 Ohio St.3d 179, 183.
In the case before us, it is undisputed that Madden provided services as a construction supervisor and that those services resulted in the completion of the four homes. Two of the homes were sold, one for $69,900 and the other for $79,900. The remaining two homes were leased at a rent of $750 per month. Therefore, some competent, credible evidence was offered to show that Duane J. Tillimon and DJT, Inc., as well as Equity, benefitted from the services provided by Madden. It would be unjust to allow Tillimon and DJT, Inc. to retain this benefit without payment to Madden. Therefore, the trial court's judgment awarding Madden $10,500 is not against the manifest weight of the evidence. Moreover, because this is a quasi-contract imposed by operation of law, the trial court did not err in finding Duane J. Tillimon and DJT, Inc. jointly and severally liable for the payment of this award.
Finally, appellants assert that the trial court failed to fully address their cross-claim against Madden for failure to complete construction in a timely manner and in denying those cross-claims.
A review of appellants' cross-claim reveals that the first, second and third claims are based upon the original written contract(s) which were not applicable to the transaction occurring between Madden, DJT, Inc., and Duane J. Tillimon.
Appellants' sixth claim for relief, a request for repayment of a mechanic's lien due to the nonpayment of Jennite Company's bill, is also derivative of the contract(s) that were no longer in effect. That is, the evidence showed that despite the fact that Tillimon requested extras or upgrades, appellants insisted on using $46,000 as the limit for the costs of construction and paid Madden accordingly. Therefore, there were insufficient funds to pay Burgin, Madden, and Jennite Company.
Appellants' fourth and fifth claims are based on Madden's alleged "code violations" involving the front steps to the new houses and the placement of the accesses to the attics of the those houses. According to appellants, these violations prevented them from timely obtaining occupancy permits from the city of Toledo. The fourth claim asks for additional "construction interest" in the amount of $4,230.23 paid by DJT, Inc. for the period between December 19, 1997 to April 1, 1998, when repairs were completed. The fifth claim for relief asks for reimbursement of real estate taxes, hazard insurance and utilities totaling $1,551.13 during the same period.
Four important findings made by the trial court are dispositive of appellants' fourth and fifth claims for relief. First, the court determined that the original contract, Contract I, was not in effect. Therefore, Panford could not be considered the general contractor in this case. Second, the court held that "[a]ll essential documents including National City Bank financing, building permits, notice of commencement, * * * evidenced DJT, Inc. as general and original contractor." Third, the court found that Madden acted only as the construction supervisor. Fourth, the four houses were deemed completed by National City Bank as of October 15, 1997. Based upon our review of the record of this case we find that these findings are supported by some competent, credible evidence. Consequently, DJT, Inc., as the owner and general contractor (for, at the least, the period following Tillimon's breach of Contract I to the completion of the construction), not Madden, was responsible for compliance of the construction work to the city of Toledo Building Code.
For the foregoing reasons, appellants' assignment of error is found not well-taken, in part, and well-taken, in part. The judgment of the Toledo Municipal court is affirmed in all respects except for the following:
"IT IS THEREFORE ORDERED, ADJUDGED and DECREED as follows:
"1. Judgment in favor of Plaintiff and against DJT, Inc. and Duane J. Tillimon, individually, in the amount of Thirteen Thousand Five Hundred and 00/100 Dollars ($13,500), plus interest accruing at the statutory rate of ten percent (10%) from the date of Judgment."
This provision is vacated. Pursuant to App.R. 12(B), this court hereby enters the judgment that should have been entered on this issue:
"IT IS THEREFORE ORDERED, ADJUDGED and DECREED as follows:
"1. Judgment in favor of Plaintiff Burgin and against DJT, Inc. in the amount of Thirteen Thousand Five Hundred and 00/100 Dollars ($13,500), plus interest accruing at the statutory rate of ten percent (10%) from the date of Judgment."
Costs of this appeal are assessed to appellants.
JUDGMENT AFFIRMED, IN PART, AND REVERSED, IN PART.
Melvin L. Resnick, J., Mark L. Pietrykowski, P.J., and George M.Glasser, J., CONCUR.
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.