STEPP, Appellee,

v.

FREEMAN et al., Appellants.

[Cite as *Stepp v. Freeman* (1997), 119 Ohio App.3d 68.]

Court of Appeals of Ohio,
Second District, Greene County.

No. 96–CA–125.

Decided April 4, 1997.

■■■■■■

*Cox & Keller,* and *David W. Cox,* for appellee.

*Hammond & Stier* and *R.H. Hammond; Baker & Hostetler* and *Lisa H. Johnson,* for appellants.

FREDERICK N. YOUNG, Presiding Judge.

Donald Freeman, defendant, appeals the trial court's holding in favor of Lionel Stepp, plaintiff, on the issues of equitable estoppel and implied contract.

I

This matter arose out of the events surrounding the purchase of a winning lottery ticket on March 1, 1993. Freeman and Stepp were members of a group of employees at the Chrysler Acustar Plant who jointly purchased lottery tickets. The group had been in existence in excess of five years. Freeman took over running the group approximately two years prior to the date the group purchased the winning ticket. The group had no written rules, but it had established certain unwritten rules of conduct.

The group was restricted to only twenty members. Freeman kept a list of the members. The members pooled their money to purchase lottery tickets whenever the jackpot reached $8 million or higher. Each member was expected to contribute $2.20 to the pool. Freeman would keep track of who had paid, whether payment was in advance, and who had not yet paid by noting it in the appropriate column on the list of the members. The group purchased forty tickets and four "kickers" with the pooled money.

To increase their chances of winning, the group would use half of the pooled money to purchase tickets in Cincinnati, Ohio, and the other half to purchase tickets in Beavercreek, Ohio. Freeman purchased the tickets in Beavercreek, Ohio, and Fred Krueger, another member of the group, purchased the tickets in Cincinnati, Ohio. The tickets were purchased either on Monday, for the Wednesday drawing, or on Thursday, for the Saturday drawing. In the weeks that the group played the lottery, Stepp was in charge of making photocopies of the tickets on Tuesday and/or Friday. Sometimes, however, another member of the group, James Saul, would make the copies of the tickets if Stepp was unavailable. Stepp would leave the photocopies on Freeman's desk. Freeman would either

leave the copies on his desk for the members to pick up or would sometimes distribute some of the copies to members.

Freeman was recognized as being in charge of receiving the money for the pool. Freeman testified that a few times he had to explicitly inform or remind some members that their money was due. Freeman further stated that he had to remind all of the members of the group at least once or twice during the two years that he ran the group that their shares were due. Freeman also often indirectly reminded members that their shares were due by walking around the plant with the list of members in his hand. When the members saw Freeman with the card in his hand, they knew it was time to contribute, and they would get out their money and pay their shares without Freeman having to expressly ask for their contributions.

Members would sometimes cover other members' shares when they ran into Freeman. Furthermore, Freeman or other members would cover another member's portion of the pool if the member was absent from work. When members knew that they would be on vacation or otherwise unavailable, they would pay their contribution in advance or would inform Freeman that they would pay when they returned. Since the time that Freeman began running the group, none of the members had ever failed to participate, and no fewer than forty tickets, two for each member, had ever been purchased.

Individuals who wanted to join the group had to put their names on a waiting list and could join the group only when one of the existing members decided to leave the group. The members that actually dropped out of the group while Freeman was running it were taken off the list only after Freeman had a conversation with them and the member had conveyed to Freeman that he or she was not going to contribute any longer and that he or she was leaving the group. No member had ever been unilaterally removed from the list by Freeman because the member had not timely paid his or her share. After a member left the group, Freeman would ask the first person on the waiting list if he or she wanted to join the group. If the individual decided to join the group, Freeman would add the individual's name to the list.

In the week prior to the group purchasing the winning lottery ticket, Freeman and Stepp had a serious work-related disagreement. As a result of their disagreement, Freeman called Stepp a derogatory name and, according to Stepp, threatened him. Following their disagreement, Freeman and Stepp did not speak to one another with the exception of a few brief work-related discussions. The lottery jackpot reached $8 million over the weekend following their conflict. On the ensuing Monday, Freeman collected money from the group for the drawing by, in part, walking around with the member list in his hand. Freeman, however, did not ask for Stepp's money, nor did he inform Stepp that the lottery

had reached $8 million. Likewise, Stepp, who claims that he was unaware that the lottery had reached $8 million, did not offer his $2.20.

At the end of the day, Freeman gave Krueger the usual $20 to buy tickets in Cincinnati. Freeman put in the extra dollar himself. Freeman did not inform Krueger or Stepp that he did not consider Stepp to be included in the pool, but he did tell some other members that Stepp was out of the group because he had not paid his $2.20. Furthermore, Stepp never conveyed to Freeman that he was dropping out of the pool. Even though Freeman testified that he considered Stepp to be out of the pool, Freeman did not consult anyone on the waiting list to fill Stepp's spot. Freeman did, however, purchase nineteen, rather than twenty, tickets in Beavercreek, Ohio. Conversely, Krueger purchased the usual twenty tickets in Cincinnati. Therefore, the group had one more ticket than the group should have had if the group had purchased only enough tickets for nineteen members.

On Tuesday, Freeman asked James Saul, rather than Stepp, to make copies of the tickets, explaining that "Stepp hasn't come around." On Wednesday, March 3, 1993, the lottery group won the $8 million lottery jackpot. The winning ticket was one of the twenty tickets purchased in Cincinnati by Fred Krueger. When Stepp arrived at work on Thursday, he was informed by some of his coworkers that the group had won the lottery, and that the group considered that he was not entitled to a share of the money because he had failed to contribute his portion to the pool. The group, however, let one of the members, who was on vacation when the money for the lottery was collected, pay his $2.20 on the Friday after the group had won the lottery. The group let that member pay late because he had purportedly made arrangements with Freeman that he would pay when he returned from his vacation.

On September 1, 1993, Stepp commenced an action, claiming that he was denied his rightful share of the lottery winnings. In support of his claim, Stepp asserted three causes of action: breach of express contract, breach of implied contract, and equitable estoppel. The case was referred to a magistrate for a hearing pursuant to Civ.R. 53. The magistrate issued a finding in favor of Stepp on both the equitable estoppel and breach of contract claim, and recommended that the trial court enter judgment for Stepp in the amount of $60,000 for his portion of the accrued winnings in the years 1993–1996 and one-twentieth of each of the future jackpot payouts. Freeman put on objections to the magistrate's findings of fact and conclusions of law. The trial court considered Freeman's objections and independently reviewed the record as well as all of the evidence presented. After the court concluded its review, it rendered a thoughtful opinion in favor of Stepp on both the equitable estoppel and breach of implied contract claims. Freeman now brings this timely appeal of that decision.

## II

Freeman presents the following four assignments of error:

### 1

"The trial court erred by allowing plaintiff to assert equitable estoppel as a cause of action, when equitable estoppel is merely an affirmative defense and not a separate cause of basis for monetary recovery."

### 2

"The trial court's determination that plaintiff had stated an equitable estoppel claim was erroneous, because equitable estoppel claims require proof of actual or constructive fraud and the trial court had previously granted defendants summary judgment on plaintiff's fraud claim."

### 3

"The trial court's determination that plaintiff had proven an equitable estoppel claim and has proven a claim based upon implied contract were each against the manifest weight of the evidence."

### 4

"The trial court erred by holding that plaintiff could recover under an implied contract theory when plaintiff had not proven all of the essential contract elements."

We determine that we need not consider the assignments of error relating to the equitable estoppel claim because we believe that Stepp proved his cause of action for breach of an implied-in-fact contract, which is sufficient alone to support the court's monetary award. We find both that Stepp proved all of the elements of an implied-in-fact contract and that the court's finding that the contract was breached was not against the manifest weight of the evidence.

 It is well established that there are three categories of contracts: express, implied in fact, and implied in law. *Legros v. Tarr* (1989), 44 Ohio St.3d 1, 6, 540 N.E.2d 257, 262–263. Express and implied-in-fact contracts differ from contracts implied in law in that contracts implied in law are not true contracts. *Sabin v. Graves* (1993), 86 Ohio App.3d 628, 633, 621 N.E.2d 748, 751–752. Implied-in-law contracts are a legal fiction used to effect an equitable result. *Id.* Because a contract implied in law is a tool of equity, the existence of an implied-in-law contract does not depend on whether the elements of a contract are proven. *Id.*

■ On the contrary, the existence of express or implied-in-fact contracts does hinge upon proof of all of the elements of a contract. *Lucas v. Costantini* (1983), 13 Ohio App.3d 367, 368, 13 OBR 449, 449–451, 469 N.E.2d 927, 928–929. Express contracts diverge from implied-in-fact contracts in the form of proof that is needed to establish each contractual element. *Penwell v. Amherst Hosp.* (1992), 84 Ohio App.3d 16, 21, 616 N.E.2d 254, 257–258. In express contracts, assent to the terms of the contract is actually expressed in the form of an offer and an acceptance. *Lucas, supra.* On the other hand, in implied-in-fact contracts the parties' meeting of the minds is shown by the surrounding circumstances, including the conduct and declarations of the parties, that make it inferable that the contract exists as a matter of tacit understanding. *Point E. Condominium Owners' Assn. v. Cedar House Assn.* (1995), 104 Ohio App.3d 704, 712, 663 N.E.2d 343, 348–349. To establish a contract implied in fact a plaintiff must demonstrate that the circumstances surrounding the parties' transaction make it reasonably certain that an agreement was intended. *Lucas, supra.*

■ Stepp proved all of the elements of an implied-in-fact contract. The circumstances surrounding this pool make it inferable that a contract existed as a matter of tacit understanding. The group membership was restricted to twenty. No new members could join until one of the twenty members dropped out of the group. There was a waiting list to join the group. Members joined the group by consulting Freeman and having Freeman place them on the group roster. Placing an individual's name on the roster created an implied agreement that the individual was a member of the group. Furthermore, there was an implied agreement that each member was to contribute $2.20 to the pool whenever the group played the lottery and that the members would share the winnings equally.

■ The members thought that the group was run very informally and left the details of running the group to Freeman. Many of the members knew very little about how the group was run. Some members did not even know that the group played the lottery only when the jackpot was $8 million or higher. Most members saw their duty as a member of the group as just contributing their share whenever they saw Freeman walking around the plant with the list in his hand or were otherwise informed that their shares were due.

There was an implied agreement among the members that once their names were on the list as members of the group, they would be informed when they owed their share of the pool and how much they owed. The implied agreement was that members would be informed when their money was due either verbally by Freeman, by other members, or by seeing Freeman walking about with the list in his hand. Freeman testified that he had to expressly remind some members that their money was due a few times and that he had to remind every member of the group that their money was due at least once or twice during the

period that he ran the group. Freeman also admitted that he indirectly reminded people that there shares were due by frequently walking around the plant with the list in his hand when the group was going to be playing the lottery.

Because the members perceived the group as running informally and because Freeman had reminded the members that their money was due, a member could also count on not being dropped from the group after neglecting to make payment. No members had been unilaterally dropped from the group by Freeman because they had not paid their share in a timely manner. Those who had not paid their shares in a timely manner were dropped from the group only after Freeman had a conversation with them and they conveyed to him that they were not going to pay and that they were leaving the group.

Stepp had belonged to this group for over five years, and he had never failed to contribute to the lottery during those years. Stepp testified that he had always depended upon Freeman, who was in charge of the lottery, to inform him when the jackpot reached $8 million. Stepp testified that Freeman had always told him when his share was due and how much he owed. As consideration for being told that he owed his share, Stepp would contribute his $2.20 or Freeman would cover his $2.20.

Freeman admitted that he would sometimes cover Stepp's share even when Stepp was not absent from work. In particular, Freeman testified that sometimes the group would play the lottery twice a week and that in some instances he would only collect $2.20 from Stepp, and if they ended up playing a second time, he would put in the additional money for Stepp and collect it later. Freeman also admitted to putting in money for Stepp and collecting it later when Stepp was present but did not have enough money to contribute his share. Finally, Freeman sometimes put money in for Stepp and other members of the group when they were absent from work.

In addition to contributing his share to the group, Stepp performed a more formal role in the group than most of the other members in consideration for being informed when the group was playing the lottery. When Stepp was told that the group was playing the lottery, he would make copies of the lottery tickets. Stepp would pick up the tickets from Freeman on either Tuesday morning or Friday morning to make the copies and then return the tickets and copies to Freeman.

We believe from these facts and circumstances that there was an implied contract that Stepp, who had been a member of the group for over five years, who never had failed to contribute his share, who had a formal role in the group, whose share had been previously covered by Freeman under certain circumstances, and who had been reminded that his money was due in the past, would pay his share and perform his role in the group when he was informed that the

group was playing the lottery. This contract was breached by Freeman when he failed to inform Stepp that the group was playing the lottery.

Moreover, we are of the opinion that there was an implied agreement that Stepp would not be dropped from the group unless he had expressed his wish to leave the group to Freeman or Freeman had informed him that he was being dropped from the group for the failure to pay his share. We determine that Freeman breached this implied agreement when he unilaterally dropped Stepp from the group. Accordingly, we find that Stepp proved all of the elements of breach of implied contract and that the trial court's decision was not against the manifest weight of the evidence. The assignments of error are overruled.

Based upon the foregoing the judgment of the trial court is affirmed.

*Judgment affirmed.*

WOLFF and FAIN, JJ., concur.