OPINION
{¶ 1} On March 3, 2004, Appellant KLG Mobile Intensive Co., LLC, ("KLG") filed its complaint against Appellee, Cross-Appellant Salem Community Hospital ("SCH" or "the hospital"). KLG sought compensation for the ambulance transfer of two SCH patients in July of 2000 and July of 2001, seeking the total amount of $5,232.76 plus interest. Each patient had been admitted to the hospital and were ordered to undergo MRI testing by their respective doctors. As the hospital did not have an on-site facility at the time, these patients were required to be transported to a local testing facility and returned to the hospital The parties did not have a formal contract for the transportation of patients. SCH denied responsibility for the cost of transporting these patients and claimed that Appellant's charges were unfair, deceptive, unconscionable, and not reasonable and necessary.
 {¶ 2} Following discovery, this matter proceeded to bench trial in the Municipal Court of Columbiana County, Northwest Division. On November 30, 2005, the trial court issued its judgment entry, holding in part that SCH received no consideration for the transportation of its patients. As such, the hospital had no contractual obligation to pay. Nevertheless, the trial court concluded that SCH should pay KLG a pro rata share of the payment that SCH received from Medicare for the services provided to these patients. The trial court awarded Appellant judgment in the amount of $1,481.49 based on a constructive trust theory of liability. (Nov. 30, 2005, Judgment Entry.)
 {¶ 3} KLG timely appealed the trial court's decision, arguing that the trial court erred in failing to award it payment in full. KLG argues that the hospital is responsible for payment since SCH was obligated to provide its patients with necessary inpatient services, including MRIs. However, since SCH was forced to have its patients transported elsewhere for the necessary procedures, KLG argues that SCH is responsible to pay in full for the services it was unable to provide.
 {¶ 4} The hospital filed a cross-appeal of this decision. While not entirely clear from its filings, at oral argument in this matter SCH underscores that the cross-appeal was filed to protect the hospital in the event we reversed the trial court's underlying judgment. SCH would then argue, in the alternative, that the trial court was correct in finding a lack of consideration for any contractual liabilities and thus, KLG should not have been awarded any monetary amount for its services and we should enter judgment for SCH.
 {¶ 5} For the following reasons, we hereby affirm the trial court's decision, rendering Appellee's cross-assignment moot.
 {¶ 6} Appellant's sole assignment of error asserts:
 {¶ 7} "THE TRIAL COURT ERRED AS A MATTER OF LAW AND CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE WHEN IT FOUND THAT NO CONTRACT EXISTED BETWEEN KLG AND THE HOSPITAL AND FAILED TO AWARD KLG JUDGMENT ON THE AMOUNT OWED BY HOSPITAL."
 {¶ 8} Appellant argues that it was entitled to payment in full from SCH for the transportation services provided to SCH's inpatients at the hospital's request. Appellant claims it rendered its services to the hospital and not to the patients. Accordingly, it seeks payment in full from the hospital plus interest.
 {¶ 9} The interpretation of a contract is a matter of law subject to de novo review. Long Beach Assn., Inc. v. Jones (1998),82 Ohio St.3d 574, 576, 697 N.E.2d 208; Inland Refuse Transfer Co. v. Browning-FerrisIndustries of Ohio, Inc. (1984), 15 Ohio St.3d 321, 322, 474 N.E.2d 271.
 {¶ 10} The formation of an enforceable contract requires proof of an offer, acceptance, and consideration. Noroski v. Fallet (1982),2 Ohio St.3d 77, 442 N.E.2d 1302; Ford v. Tandy Transp., Inc. (1993),86 Ohio App.3d 364, 620 N.E.2d 996. Further, in order to bind a party to a contract, the party must consent to the terms, the contract terms must be certain and definite, and the parties must have a meeting of the minds. Episcopal Retirement Homes, Inc. v. Ohio Dept. of Indus.Relations (1991), 61 Ohio St.3d 366, 369, 575 N.E.2d 134.
 {¶ 11} There are three kinds of contracts: express, implied in fact, and implied in law. Stepp v. Freeman (1997), 119 Ohio App.3d 68, 73,694 N.E.2d 510. Contracts implied in law are not true contracts, but are quasi-contracts imposed by courts to prevent unjust enrichment.Legros v. Tarr (1989), 44 Ohio St.3d 1, 6, 540 N.E.2d 257, citingHummel v. Hummel (1938), 133 Ohio St. 520, 525, 14 N.E.2d 923.
 {¶ 12} The existence of an express or an implied-in-fact contract requires proof of all of the elements of a contract. Stepp, at 74,694 N.E.2d 510, citing Lucas v. Costantini (1983), 13 Ohio App.3d 367, 368,469 N.E.2d 927. The terms of an express contract are actually articulated in the form of an offer and acceptance.
 {¶ 13} In implied-in-fact contracts, the parties' agreement is shown by the surrounding circumstances, which includes the conduct of the parties reflecting that the parties entered into an implicit understanding. Point E. Condominium Owners' Association v. Cedar HouseAssociation, (1995), 104 Ohio App.3d 704, 663 N.E.2d 343. "The law is said to 'imply' an obligation on the part of a person who benefits from the services * * * received to pay for the services * * *."Lucas, supra, at 369, citing Ashley v. Henahan (1897), 56 Ohio St. 559,574, 47 N.E. 573. A beneficiary of services is obligated to pay the amount the services are worth. St. Vincent Med. Ctr. v. Sader (1995),100 Ohio App.3d 379, 384, 654 N.E.2d 144.
 {¶ 14} It is undisputed that there was no express contract in the instant matter. Thus, we will initially address whether an implied-in-fact contract exists.
 {¶ 15} In order to establish a contract implied in fact, a plaintiff must prove that the circumstances surrounding the parties' transaction make it reasonably certain they intended to enter into an agreement.Lucas, supra. The party claiming that an implied-in-fact contract exists must prove that the parties reached a meeting of the minds as to the terms of the transaction. Campanella v. Commerce Exch. Bank (2000),139 Ohio App.3d 796, 808, 745 N.E.2d 1087, citing Lucas, supra, at 368.
 {¶ 16} Thus, KLG had the burden to prove that it and SCH had an agreement which included an offer, acceptance, and consideration for the transportation of two of SCH's patients.
 {¶ 17} Appellant, KLG Mobile Intensive Company, LLC, is an advanced care ambulance service located in Salem, Ohio. KLG has a mobile intensive care unit vehicle that is regulated by the State of Ohio. KLG's ambulances possess a higher degree of care level based on the higher degree of equipment contained in its vehicles, including medications and either a registered nurse or a physician on board.
 {¶ 18} KLG's medical director and part owner, Dr. Anita Zemack, explained that most of the patients transferred by KLG are already in a critical care setting and are being transported from one hospital to another. When KLG transports a Medicare patient from one hospital to another it bills Medicare directly. However, when a patient is already in the hospital, KLG cannot directly bill Medicare.
 {¶ 19} The charges in the instant matter concern two transports. On July 9, 2000, a SCH inpatient, "patient A", was transferred by KLG at her physician's request in order to secure an MRI. The hospital could not provide MRI services at the time, so KLG's services were sought by the hospital to transfer patient A to an MRI facility located on the same street less than one mile away from the hospital. This facility has since become part of SCH. Based on the condition of patient A, her transport was categorized as an advanced life support run ("ALS"). (Tr., pp. 11, 28, 30, 31.)
 {¶ 20} KLG's base charge for an ALS run was $700 one-way in addition to $9.00 per mile traveled. The base price included the cost of the nurse or physician as well as any required medications. (Tr., pp. 24, 28.) KLG's bills for the transfer of patient A to and from her MRI initially totaled $1,418. (KLG's Dec. 7, 2001, Statements.)
 {¶ 21} Dr. Zemack stated on cross-examination that the service was provided to the patient and that typically the patient is responsible for these services. Further, if the service is covered by Medicare, then KLG is bound to accept what Medicare pays. Medicare advised KLG that these services are traditionally billed to and paid for by the hospitals because the MRI service was required to be part of its inpatient services. Thus, KLG billed SCH, and KLG refused to accept less than payment in full. (Tr., pp. 39-40, 52, 88, 96.)
 {¶ 22} Further, the hospital asked KLG to bill Medicare before billing SCH. Defendant's Exhibit 2, a letter from KLG sent to SCH regarding patient A, provides in part, "Medicare denied claim, since patient was an in-patient [sic]. Spoke with Medicare, Part A and they said that we should receive payment from the hospital. They said that the Hospital will need to bill Part A and receive reimbursement from them, since patient was an in-patient [sic] at time of service." (Def.'s Exh. 2.)
 {¶ 23} KLG office manager and billing clerk, Christine Roberts, also testified at trial. She explained that she initially billed Medicare for patient A's transport since that was the listed insurer. Medicare has two parts: part A is the hospital portion of the coverage and part B covers other medical services. KLG's transportation services are evidently usually covered under Medicare part B. Upon Medicare's rejection of the bill, Roberts was advised that it was rejected because, "it needed to be billed to Medicare, Part A." (Tr., p. 102.)
 {¶ 24} Roberts then contacted Medicare part A, and they advised her that, "since the patient is an inpatient we need to bill the hospital and it's their responsibility to bill them [Medicare]." Thus, Roberts billed SCH; she never billed the patient. (Tr., p. 119.) Thereafter, KLG refused to accept anything but payment in full from the hospital. (Tr., pp. 102-103.)
 {¶ 25} On July 14, 2001, SCH requested the roundtrip transfer of its inpatient, "patient B", from the hospital to the same MRI facility. This transfer was categorized as a mobile intensive care unit ("MICU") run. A MICU base charge is $1,500 one way with a $15.50 per mile fee. This transfer also required the unit's nurse to attend and assist during the MRI scan at the MRI facility, which invoked an additional charge of $391.88. KLG's bill for the roundtrip transfer of patient B initially totaled $3,422.88. (Tr., pp. 29, 31, Exh. A.)
 {¶ 26} KLG never sent its statement for services for patient B to Medicare based on its experience regarding patient A. Instead, Roberts directly billed the hospital as Roberts explained, "[b]ecause this patient was in the hospital, and according to Medicare if they're in the hospital that it's the hospital's responsibility." (Tr., p. 111.)
 {¶ 27} It is undisputed that both patients A and B were covered under Medicare and that KLG has a contract with Medicare, which binds it to accept what Medicare pays. SCH likewise has a similar contract with Medicare. However, KLG and SCH did not have a contract with one another.
 {¶ 28} Deborah K. Bowers testified on the hospital's behalf. She has been the Director of Patient Accounting at SCH for 18 years and is responsible for the collection, billing, and receivables at the hospital. Bowers explained that the hospital submitted both patient A and B's bills electronically to Medicare, and then in return, the hospital received a one-time lump sum payment referred to as a DRG, a diagnostic related group, for each patient.
 {¶ 29} Bowers explained that Medicare submits its payment this way for all ancillary services for a particular patient, including room and board. DRG does not include payment for physician fees. DRG charges include services that a patient needs but that the hospital cannot provide. Medicare requires that all of a patient's bills be "bundled" into the hospital's bill because the patient was in the hospital at the time of service. (Tr., pp. 128-130.)
 {¶ 30} Then, in order to share the reimbursement, SCH contacts the other care providers and discusses the charges and, "because all of the providers understand how Medicare reimburses, we usually negotiate, discuss how we could reimburse them, what percent." (Tr., pp. 130-131.) However, there is evidently no set reimbursement schedule issued by Medicare to coincide with its lump sum payments.
 {¶ 31} According to Bowers, Defendant's Exhibit 5, page 2, breaks down KLG's charges and the allowable Medicare reimbursement rates had KLG been able to bill Medicare directly. It states that an ALS run with a KLG charge of $700.00 and $9.00 per mile will be reimbursed $391.74 and $5.87 respectively by Medicare. A MICU run with a KLG fee of $1,500.00 and $15.50 per mile will be paid $582.96 and $6.15 per mile by Medicare. According to these allowable rates, Medicare would have paid a total of $1,973.44 for patient A and B's runs had it been able to directly pay KLG for these runs. (Tr., pp. 73, 132, Defendant's Exh. 5, p. 2.)
 {¶ 32} On cross-examination, Bowers explained that as long as a patient is in house, the hospital has to, "absorb those charges [transport charges], because that's Medicare's bundling rules." (Tr., p. 134.) Bowers also explained that it is standard practice in the medical community to pay medical providers a percentage of their bill proportionate to the entire amount that the hospital receives from Medicare.
 {¶ 33} Bowers specifically admitted that SCH was reimbursed by Medicare for both patient A and B's transports by KLG. Patient A's total DRG Medicare reimbursement to the hospital was $4,525.92 for all services including KLG's but excluding physician fees pursuant to the bundling rules. Patient B's total Medicare DRG reimbursement totaled $3,147.56. Again, these amounts were paid to cover all of both patients' ancillary medical services during their hospital stays, however, Medicare does not provide a break down with its DRG reimbursements. (Tr., pp. 131, 136-137.)
 {¶ 34} Michael Giangardella also testified at trial. He is the hospital's vice president of finance and is responsible for SCH's billing to Medicare. (Tr., pp. 141-142.)
 {¶ 35} Giangardella explained that he became aware of KLG's outstanding bills and he asked KLG to "share in the payment" of these bills, "because [the hospital] only get[s] one payment from Medicare. * * * [Giangardella stated that KLG's] bills were almost more than what [the hospital] received for the total stay of these patients." (Tr., pp. 142-143.)
 {¶ 36} Giangardella testified that in allocating KLG's services as compared to the other charges incurred for these patients, KLG was approximately 19% of the hospital's total charges for all services rendered. Thus, in an effort to settle the dispute with KLG, Giangardella offered to pay them 25% of the DRG reimbursement. However, and contrary to Bowers' testimony, Giangardella stated that whether a patient has an ambulance transport does not affect the amount of money the hospital receives from Medicare. (Tr., p. 144.)
 {¶ 37} In Giangardella's opinion, it is the hospital's responsibility to act "as a conduit" of the lump sum Medicare DRG money and to pay it to the other providers. He explained that this is, "what's happening in the industry." (Tr., p. 149.) However, he did not know whether KLG was legally bound to accept what SCH offered it. (Tr., p. 151.)
 {¶ 38} Based on the evidence presented at trial, there was no implied-in-fact contractual obligation between SCH and KLG. While the hospital certainly benefited from having its patients receive the necessary testing, testing it was apparently required to have provided, its benefit alone did not create an implied-in-fact contract. KLG has failed to establish that the parties reached a meeting of the minds in this case. KLG also did not establish any certain and definite contract terms. As such, the evidence did not make it clear that SCH and KLG entered into an agreement. In fact, it is clear from the record that the parties had no such agreement. Thus, Appellant's sole assignment of error lacks merit and is overruled.
 {¶ 39} Notwithstanding the lack of an actual or implied in fact contract between the parties, the trial court concluded that the evidence established an obligation for the hospital to reimburse KLG for its services. In furtherance of this end, the trial court determined that a trust existed between the parties. This is the subject of the hospital's argument on appeal, which asserts:
 {¶ 40} "IN ADDITION TO THE FAILURE OF CONSIDERATION NOTED BY THE TRIAL COURT, KLG FAILED TO PROVE ANY OBLIGATION FOR SCH TO PAY THE AMBULANCE BILLS. THERE IS NO EVIDENTIARY BASIS FOR THE COURT'S RULING THAT A CONSTRUCTIVE TRUST EXISTS FOR A PROPORTIONATE SHARE OF THE MEDICARE PAYMENT TO SCH."
 {¶ 41} SCH argues that the trial court's decision was in error in finding that the hospital had an obligation or a constructive trust requiring it to pay KLG. However, at oral argument SCH's counsel indicated that it was merely preserving this argument as error in the event that we agree with KLG and reverse the matter on appeal. Based on counsel's statements, since we overruled Appellant's sole assignment of error, Appellee's alleged error is now moot. App.R. 12(A)(c).
 {¶ 42} Nonetheless, and for clarity's sake, we will briefly address SCH's claimed error. A constructive trust has been identified as a remedy against unjust enrichment. Ferguson v. Owens (1984),9 Ohio St.3d 223, 225, 459 N.E.2d 1293. Again, quasi-contracts are not true contracts, but are contracts implied in law by courts to prevent unjust enrichment. A quasi-contract or constructive trust, "is usually invoked when property has been acquired by fraud. However, a constructive trust may also be imposed where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud." Id. at 226.
 {¶ 43} In a dissimilar case, the Ohio Sixth District Court of Appeals noted,
 {¶ 44} "Medicare is a federal assistance program that provides health insurance coverage to the elderly and disabled. * * * it is the recipient's status that qualifies him or her for Medicare benefits. Absent the recipient's qualifying for benefits under the Medicare program, a medical provider has no claim for reimbursement."Medcorp, Inc. v. York Twp., 6th Dist. No. F-02-019, 2002-Ohio-7308, at ¶ 14.
 {¶ 45} It thereafter concluded that the Medicare benefits, "belong to the individual receiving the medical care, and are simply assigned over to the medical provider[.]" Id. at ¶ 15.
 {¶ 46} Keeping this idea in mind, the trial court's imposition of a constructive trust in this case was appropriate. KLG provided services to two SCH patients; services in aid of obtaining testing SCH was apparently required to provide and at SCH's request. As a result of Medicare bundle billing rules, the hospital was forced to absorb all of its patients' charges in exchange for a lump sum DRG payment from Medicare. In turn, SCH is obligated to share these Medicare proceeds with its patients' service providers.
 {¶ 47} Further, SCH's employee admitted that the hospital received a bundled payment from Medicare, in part for KLG's services on patient A and B's behalf. Thus, it is logical to hold that SCH was holding the Medicare reimbursements in trust for KLG. As the trial court found, the hospital was obligated to pay KLG its proportionate share of the DRG proceeds based on a quasi-contract theory.
 {¶ 48} According to SCH, patient A's total hospital DRG charges were $6,545.20, and of this, KLG's charges were $1,418.00 or 21.66%. Further, patient A's total Medicare DRG reimbursement totaled $3,147.56; thus, KLG's proportionate share is $681.76.
 {¶ 49} Patient B's total DRG hospital charges, including her transport, totaled $19,367.44. Of this amount, KLG's charges were $3,423.30 or 17.67% of the bill. Patient B's total Medicare DRG reimbursement to the hospital was $4,525.92. Thus, pursuant to the constructive trust theory, KLG was entitled to 17.67% of $4,525.92 or $799.73.
 {¶ 50} In conclusion, the record reflects that the trial court was correct in its determination that this matter involves a contract implied in law obligating the hospital to pay KLG its proportionate share of the DRG charges, which totals $1,481.49 plus interest. Accordingly, the decision of the trial court is affirmed.
Vukovich, J., concurs. DeGenaro, P.J., concurs.