[Cite as *Wajda v. M&J Automotive, Inc.*, 2010-Ohio-6584.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| CHESTER D. WAJDA, | ) | |
| | ) | |
| PLAINTIFF-APPELLEE, | ) | |
| | ) | |
| VS. | ) | CASE NO. 10-MA-7 |
| | ) | |
| M&J AUTOMOTIVE, INC. d.b.a. | ) | OPINION |
| MONTROSE BUICK, PONTIAC, GMC, | ) | |
| CADILLAC, | ) | |
| | ) | |
| DEFENDANT-APPELLANT. | ) | |

CHARACTER OF PROCEEDINGS:      Civil Appeal from Court of Common
Pleas of Mahoning County, Ohio
Case No. 08CV278

JUDGMENT:      Affirmed

APPEARANCES:
For Plaintiff-Appellee      Attorney Michael D. Rossi
151 East Market Street
P.O. Box 4270
Warren, Ohio 44483

For Defendant-Appellant      Attorney Carl Edward Patrick
3960 Medina Road
Akron, Ohio 44333

JUDGES:

Hon. Gene Donofrio
Hon. Cheryl L. Waite
Hon. Mary DeGenaro

Dated: December 30, 2010

DONOFRIO, J.

{¶1} Defendant-appellant M&J Automotive, Inc. d.b.a. Montrose Buick Pontiac GMC Cadillac (Montrose) appeals from an adverse judgment entered in the Mahoning County Common Pleas Court. Through its two assignments of error, Montrose posits that the evidence introduced at trial cannot support the damage award granted to plaintiff-appellee Chester D. Wajda (Wajda) in his wage claim against Montrose, his former employer.

{¶2} Montrose is a factory-authorized car dealership located in Hermitage, Pennsylvania. (Brief of Appellant at 2.) In the months prior to August 2007, Wajda and John Price (Price), a personal acquaintance of Wajda and salesman at Montrose, engaged in discussions regarding employment opportunities at Montrose. (Tr. 38.) Price informed Wajda that Jack Dugan (Dugan), a general manager at Montrose, was attempting to build an experienced sales team and was offering competitive compensation packages to achieve this goal. (Tr. 13, 25-26; Deposition of Jack Dugan at 4-5.)

{¶3} At the time, Wajda was an employee of Sweeney Buick (Sweeney) in Youngstown, Ohio. (Tr. 17.) Wajda, however, had recently been involved in a dispute with management at Sweeney over payment for a particular sale, and so decided to meet with Dugan to discuss the possibility of employment at Montrose. (Tr. 17, 36-38.)

{¶4} Dugan himself was a recent addition to Montrose, having been hired to expand the sales staff and bolster business. (Depo. at 4-5, 10-11.) To that end, Dugan suggested in his testimony that he could make deals independently of upper management to attract desirable personnel. (Depo. at 20-21.) Citing Montrose's relatively weak base salary and poor reputation, Dugan related that it was necessary to bring in experienced, established salespersons at a guaranteed pay rate for an introductory period. (Depo. at 6.) According to Dugan, most of the staff he recruited came in with guarantees of $4,000 to $8,000 per month for somewhere between three and six months. (Depo. at 7-8.) Dugan noted that he "pretty much brought in people at the watermark they're leaving." Id. Dugan was never apprised of any

dissatisfaction with his hiring practices, and Montrose does not dispute that Dugan operated with relatively little oversight. (Depo. at 27.)

**{¶5}** Having formerly been Wajda's sales manager at Sweeney, Dugan remembered Wajda as being "high performing" and "a good used car salesman," characterizing him as "a welcome addition to our sales team" at Montrose. (Depo. at 4, 25.) While he was unable to recall details of any agreement, Dugan maintained that Wajda "came in on some type of guarantee." (Depo. at 5.) However, there was a considerable amount of conflict in the testimony on this point.

**{¶6}** While Dugan was adamant that Wajda had a guarantee in place, Dugan also said that Price directly negotiated the terms. (Depo. at 5-6.) Price, however, stated that he was not involved in the final discussion of compensation, recalling that he purposely left the room when Dugan and Wajda discussed pay because such matters were generally "personal between the general sales manager and the salesperson." (Tr. 14.) Price further testified that he personally came in with a guarantee of $7,000 per month for six months, but that he did not have firsthand knowledge of anyone else's compensation plan, and that any information Price had regarding a guarantee for Wajda came from either Wajda or Dugan. (Tr. 15-16.)

**{¶7}** Wajda contended that, in early discussions with Price, he informed Price that he was looking for a guarantee of $6,000 per month for six months. (Tr. 28.) According to Wajda, Price thought Dugan would be able to accommodate his demands. (Tr. 38.) Wajda said that, in subsequent negotiations with Dugan, he presented this figure and explained to Dugan that he had been having success at Sweeney and was unwilling to compromise the financial stability of his family without a comparable guarantee. (Tr. 28.) Wajda testified that he ultimately left his employment at Sweeney and joined the sales team at Montrose for a guarantee from Dugan of $4,500 per month for four months and an increased commission percentage plan. Id. Wajda claimed this agreement was memorialized in a written contract signed by both him and Dugan. (Tr. 41-42.) However, Wajda alleged that, on the day of his termination from Montrose, someone had rummaged through his

desk and that this document was missing thereafter. Id. As such, there is no documentary evidence of this agreement.

**{¶8}** Moreover, Wajda had difficulty recalling the specifics of the agreed-upon commission structure. (Tr. 53-55.) Wajda initially stated that he and Dugan agreed that Wajda would be entitled to ten percent of the manufacturer's suggested retail price on new cars, and 30 percent of the gross profit on used cars. (Tr. 28.) Upon cross-examination, Wajda conceded that he was mistaken, and that the commission plan that he and Dugan agreed upon was for 25 percent of the gross profit on new cars, less advertising, and 30 percent of the gross profit on used cars, less $300. (Tr. 54-55; Defendant's Exhibit 1B.) These terms were reflected in a document titled "Payroll Change Notice." (Defendant's Exhibit 1B.) In the absence of Wajda's alleged written contract, this form is the only documentary evidence with any reference to Wajda's pay plan.

**{¶9}** Further, Joseph Stefanini (Stefanini), vice president of Montrose Auto Group and vice president and part-owner of the Hermitage Montrose dealership, testified that he would have had to give final approval on any proposed guarantee for an incoming employee, and that Wajda had no such guarantee. (Tr. 95) In addition, Stefanini explained that Price received a guarantee only because he was slated for management, and that he would not authorize a guarantee for any person hired strictly as a salesperson, as was the case with Wajda. (Tr. 93-94) Stefanini did acknowledge that Dugan was given a fair degree of latitude in making hiring decisions, and that Wajda was brought in on a better-than-standard commission structure – in fact, Stefanini's signature appears on the document authorizing this pay plan. (Tr. 91-92; Defendant's Exhibit 1B.) Furthermore, the employee handbook notes that "[i]t is the policy of the Montrose Auto Group to pay wages and provide benefits which are competitive with those paid for similar jobs in our community and industry." (Plaintiff's Exhibit 1.) However, in referencing his company's general employment policies, Stefanini testified that employment was on an at-will basis, stating: "[w]e have never ever given an employment contract." (Tr. 97.)

**{¶10}** While the terms of Wajda's employment remained in dispute, both parties stipulated that Wajda began working for Montrose on August 15, 2007. (Tr. 106.) When questioned about Wajda's job performance, Price testified that "[Wajda] was aggressive. * * * [H]e was a hard worker and seemed to be a very good employee. The sales just weren't coming." (Tr. 20.) Dugan reasoned that the employees he brought in from Youngstown and Warren were slower to establish a clientele due, in part, to the physical distance from their previous customer base and that, more generally, "business wasn't very good." (Tr. 26.) Wajda conceded that his sales numbers were off from what they had been at Sweeney, but he, too, pointed to the difficulty in establishing a new customer base, noting that the possibility of diminished sales during this transitional period is precisely the reason for offering the guarantee. (Tr. 44, 56.)

**{¶11}** Wajda testified that, in September 2007, he began having issues with his compensation at Montrose. (Tr. 30-33.) According to Wajda, he was not paid the proper commission percentage on certain used vehicles. Id. Wajda claimed that he immediately notified sales manager Allen Deal (Deal) of the problem, and that Deal addressed the situation on at least two occasions, modifying those deals to reflect the higher commission percentage. (Tr. 31.) However, it soon became apparent to Wajda that management would not honor his purported guarantee. (Tr. 31, 47.) Wajda testified that when he approached Deal about the issue of his guarantee, Deal informed Wajda that his sub-par sales record did not warrant the payment of any guarantee. Id. For his part, Deal did attest that he thought Wajda was underperforming, but Deal maintained that Wajda never at any time came to him with a complaint about not receiving a guarantee. (Tr. 66.) Furthermore, although the employee handbook made clear that Wajda could address his grievance with *any* member of management, he never brought the issue of his guarantee to any other superiors. (Tr. 50-52.) Wajda claimed this is because certain managers – specifically, Dugan and Stefanini – were consistently unavailable. (Tr. 32, 50-52.)

{¶12} Deal testified that he confronted Wajda about his job performance in early November, and it was then that Wajda revealed he was looking for employment elsewhere. (Tr. 69-70.) After conferring with another member of the management team, Deal decided to end Wajda's employment with Montrose. (Tr. 71.) Per company policy, Deal and another employee, Tom Bishop, conducted an exit interview with Wajda. (Tr. 72-73.) A series of questions on the standardized, five-page form centered on compensation. (Defendant's Exhibit 3.) Specifically, one question asked whether the employee felt the pay was adequate. Id. Deal asserted that he went over these questions with Wajda, and at no time did Wajda voice his discontent with his payment package. (Tr. 72-74.)

{¶13} In Wajda's version of events, Deal questioned Wajda about whether he was looking for a new job after hearing a rumor from another employee. (Tr. 55-56.) When confronted, Wajda claimed that an individual named Jeff Zombar had contacted *him* about an employment opportunity and that Wajda and this gentleman "were just talking about the possibilities." (Tr. 55.) Wajda maintained that, at the time of his termination, he was ready, willing, and able to continue his employment with Montrose through the fourth month of the alleged agreement. (Tr. 35.) Moreover, Wajda asserted – and Montrose did not dispute – that during his tenure Wajda never requested any time off or took a sick day, and that he even came in on his scheduled days off, on occasion. (Tr. 34, 57.)

{¶14} The parties stipulated that the date of Wajda's termination was November 7, 2007. (Tr. 106.) They further stipulated that, for the entire duration of his employment, Wajda was paid the sum of $6,713.62. (Tr. 35.)

{¶15} On January 18, 2008, Wajda filed suit against Montrose, alleging breach of contract. (Complaint.) Wajda sought to recover $11,286.38 from his former employer – the balance Wajda believed he was owed from his four-month, $4,500-per-month guarantee. Id. Montrose answered, denying all of Wajda's allegations. (Answer.)

**{¶16}** The matter was tried before a magistrate on June 15, 2009. (Magistrate's Decision.)  In a decision filed on November 16, 2009, the magistrate found in Wajda's favor and recommended judgment against Montrose in the sum of $11,286.38, together with interest and costs. Id.  In determining Wajda's evidence "to be the more credible," the magistrate's decision included the finding that "it is unlikely that [Wajda] would leave his current employer unless his prospective employer guaranteed him compensation in an amount greater than that which he had been receiving, i.e., '$4,500 p/m for 4 months,' * * *." Id.

**{¶17}** The lower court's docket sheet evidences that, on December 1, 2009, Montrose filed objections to the magistrate's decision. (Docket Sheet.)  However, those objections are inexplicably missing from the record.  Nonetheless, the trial court adopted the magistrate's decision and entered judgment on December 14, 2009, finding that "no written objections have been filed and that no error of law or other defect appears on the face of the Magistrate's Decision." (Judgment Entry.)

**{¶18}** On January 13, 2010, Montrose filed this timely appeal. (Notice of Appeal.)  On March 2, 2010, this Court granted an extension for Montrose to file its initial brief, which Montrose subsequently filed on March 26, 2010. (Brief of Appellant at 3.)  On April 14, 2010, Wajda likewise filed a brief with this Court. (Brief of Appellee.)  In addition to addressing the substance of Montrose's assignments of error, Wajda asserted that Montrose's arguments on appeal were procedurally defective pursuant to Civil Rule 53(E)(3), in that Montrose failed to object to the magistrate's decision in a timely manner. (Brief of Appellee at 3.)  In response, Montrose filed a reply brief on April 26, 2010. (Reply Brief of Appellant.)

**{¶19}** On appeal, Montrose presents two assignments of error for review:

**{¶20}** "THE TRIAL COURT'S DAMAGE AWARD ON MR. WAJDA'S WAGE CLAIM WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND MUST BE REVERSED."

**{¶21}** "THE TRIAL COURT'S DAMAGE AWARD ON MR. WAJDA'S WAGE CLAIM WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND MUST BE REVERSED."

**{¶22}** Both assignments of error require the reviewing court to consider the evidence in relation to the damage award. This Court has previously held that the same standard of review applies to both challenges. See *Lydic v. Earnest*, 7th Dist. No. 02 CA 125, 2004-Ohio-3194, at ¶20. As such, Montrose's assignments of error will be analyzed together.

**{¶23}** Before reaching the substance of Montrose's arguments, however, this Court must address Wajda's assertion that the basis of Montrose's entire appeal is improper, pursuant to Civ.R. 53(E)(3).

**{¶24}** While Wajda's characterization of the law on this matter is essentially accurate, Wajda neglects the fact that Civ.R. 53 was amended effective July 1, 2006, and that Civ.R. 53(E)(3) was replaced by Civ.R. 53(D)(3)(b)(iv). The two provisions, however, are fundamentally the same. The revised rule states: "*Waiver of right to assign adoption by court as error on appeal.* Except for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53 (D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)."

**{¶25}** Civ.R. 53(D)(3)(b)(i) establishes a timeframe for the filing of such objections: "*Time for filing.* A party may file written objections to a magistrate's decision within fourteen days of the *filing* of the decision, whether or not the court has adopted the decision during that fourteen-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. If a party makes a timely request for findings of fact and conclusions of law, the time for filing objections begins to run when the magistrate files a decision that includes findings of fact and conclusions of law." (Emphasis added.)

**{¶26}** The magistrate's decision was filed on November 16, 2009, and copies of the decision were sent to the parties by regular mail that same day. The record indicates that Montrose filed objections to the magistrate's decision on December 1, 2009 – fifteen days after the filing of the decision. Therefore, by rule, Montrose is not permitted to assign as error on appeal the court's adoption of any finding of fact or conclusion of law unless the party timely objected to that finding. *State ex rel Booher v. Honda of Am. Mfg., Inc.* (2000), 88 Ohio St.3d 52, 53, 723 N.E.2d 571.

**{¶27}** The Ohio Supreme Court has firmly adhered to these procedural mandates, as reiterated in a recent ruling in which the court dismissed an appeal from a magistrate's decision and affirmed the lower court's judgment with a terse explanation: "[a]ppellant's arguments derive directly from the conclusions of law provided in the magistrate's decision. Appellant, however, did not object to those conclusions as Civ.R. 53(D)(3)(b) requires. Thus, * * * we can proceed no further." *State ex rel. Findlay Industries v. Indus. Comm. of Ohio*, 121 Ohio St.3d 517, 2009-Ohio-1674, 905 N.E.2d 1202, at ¶3. See, also, *Mahoning Natl. v. Wilhelm*, 7th Dist. Nos. 04 MA 248, 04 MA 249, 2006-Ohio-6132, at ¶7 (holding that a party shall not assign as error on appeal the court's adoption of any magistrate's finding of fact or conclusion of law unless the party has objected to that finding or conclusion); *Miller v. Smith*, 2d Dist. No. 19958, 2004-Ohio-1310, at ¶22 (holding that the assigned error is waived by the failure to file timely objections to the magistrate's decision with respect to that error).

**{¶28}** For its part, Montrose invokes Civil Rule 6(E) in support of its assertion that it had three additional days to file its objections to the magistrate's decision since the decision was mailed to it. Civ.R. 6(E) provides, in part: "Whenever a party has the right or is required to do some act or take some proceedings within a prescribed period after the service of a notice or other paper upon him and the notice or paper is served upon him by mail, three days shall be added to the prescribed period." Thus, Montrose contends that its objections *were* in fact timely. And by failing to address the issues allegedly preserved by its objections, the trial court's judgment entry was

improper. Consequently, Montrose believes it "was deprived its opportunity to contest the facts, introduce new evidence or argue the legal conclusions adopted by the Court." (Reply Brief of Appellant.)

**{¶29}** However, as this court has observed, "[t]he Ohio Supreme Court has held that Civ.R. 6(E), known as the three-day mail rule, does not extend the time for filing objections to a magistrate's decision. *Duganitz v. Ohio Adult Parole Auth.* (2001), 92 Ohio St.3d 556, 557, 751 N.E.2d 1058, citing *Pulfer v. Pulfer* (1996), 110 Ohio App.3d 90, 92-93, 673 N.E.2d 656. The Supreme Court stated that Civ.R. 53 requires written objections to a magistrate's decision to be filed within 14 days of the filing of the magistrate's decision, not within 14 days of the serving of the decision. Id." Thus, despite Civ.R. 6(E), the objections in this case were untimely filed.[1]

**{¶30}** Despite Montrose's failure to file timely objections to the magistrate's decision and, therefore, preserve those issues for appeal, the substantive merits of Montrose's assigned errors would nevertheless fail. As noted, this Court has held that the standard of review for appeals in civil cases challenging manifest weight *or* sufficiency of the evidence is the same: "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court * * * ." *Lydic* at ¶20, quoting *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280, 376 N.E.2d 578. Matters of law, of course, are reviewed de novo by this Court. *Ohio Bell Tel. Co. v. Pub. Util. Comm.* (1992), 64 Ohio St.3d 145, 147, 593 N.E.2d 286. However, the appellate court must bear in mind the trier of fact's superior, first-hand perspective in weighing the evidence and judging the demeanor and credibility of witnesses. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273.

**{¶31}** Wajda framed his action as a breach of contract claim. Wajda asserted that the parties formed a contract when Montrose made an offer of employment and Wajda accepted the position of salesman. In Wajda's estimation, the guarantee of

---

1. The magistrate's decision in this case cautioned the parties that "[p]ursuant to Civil Rule 53(D)(3), the parties shall have fourteen (14) days from the date of the *filing* of this Decision to file written Objections with the Clerk of Court's Office." (Emphasis added.) (Docket 16.)

$4,500 per month for four months was an explicit contractual term, and the failure to pay this amount constituted a breach. The complaint specifically alleged:

**{¶32}** "1. On or about 8/16/07, pursuant to Defendant's offer of employment made in Boardman Township, Mahoning County, Ohio in 7/07, the parties entered into a certain employment contract providing for Plaintiff's employment as a salesman for the Defendant.

**{¶33}** "2. Among its terms, the contract provided for Defendant's payment to Plaintiff of an amount no less than the sum of $4,500 per month, from month to month, for four consecutive months.

**{¶34}** "3. Plaintiff substantially performed per the terms and conditions of the parties' contract.

**{¶35}** "4. Defendant breached the contract by paying Plaintiff only the sum of $6,713.62 throughout that stipulated four-months' [sic] period of time." (Docket 1.) Montrose, in turn, denied the existence of any contract, maintaining that Wajda was employed on an at-will basis.

**{¶36}** A contract is generally defined as a promise, or a set of promises, actionable upon breach. *Kostelnik v. Helper*, 96 Ohio St.3d 1, 2002-Ohio-2985, 770 N.E.2d 58, at ¶16. "To prove the existence of a contract, a party must establish the essential elements of a contract: an offer, an acceptance, a meeting of the minds, an exchange of consideration, and certainty as to the essential terms of the contract." *Schambach v. Afford-A-Pool & Spa*, 7th Dist. No. 08 BE 15, 2009-Ohio-6809, at ¶8, quoting *Juhasz v. Costanzo* (2001), 144 Ohio App.3d 756, 762, 761 N.E.2d 679.

**{¶37}** It is well established that there are three categories of contracts: express, implied in fact, and implied in law. *Legros v. Tarr* (1989), 44 Ohio St.3d 1, 6, 540 N.E.2d 257. Further, contracts may be written or oral. *Ayad v. Radio One, Inc.*, 8th Dist. No. 88031, 2007-Ohio-2493, at ¶24, citing *Eckliff v. Walters*, 168 Ohio App.3d 727, 2006-Ohio-4817, 861 N.E.2d 843, at ¶22.

**{¶38}** The magistrate's decision concluded (by implication) that some form of agreement existed between the parties. However, the magistrate, operating within

his discretion, chose not to elaborate on his reasoning aside from stating a single finding, thereby leaving in question the theory under which he determined a contract was formed. As such, it is necessary to review each category to establish whether "there is some competent, credible evidence going to all the essential elements of the case." *Lydic* at ¶20.

**{¶39}** The record does not demonstrate the existence of any written contract. No documents purporting to be a contract were introduced into evidence by Wajda. In his testimony, Wajda alleged that he and Dugan executed a written contract, but that an unidentified person ostensibly took it from his desk just prior to his dismissal. (Tr. 41-42.) While Dugan said that he generally put the specifics of any guarantee in writing, he did not remember signing any documents relating to a guarantee for Wajda. (Depo. 5, 13.) Without more, it seems unlikely that Wajda's bare allegation could prove the existence of a written agreement. However, despite Wajda's testimony, his complaint does not actually assert that he had a written contract, so the absence of any documentary evidence to that effect is not fatal to his claim.

**{¶40}** Montrose seems to suggest that a written contract may have existed, stating in its brief: "[w]hat is clear from the trial transcript is that Mr. Wajda did not prove that he had any contract other than the written payroll change notice identified by Mr. Joe Stefanini." (Brief of Appellant at 6.) The "Payroll Change Notice" form indicated that Wajda was to receive a higher-than-standard commission percentage, but made no mention of any guarantee. (Defendant's Exhibit 1B.) Handwriting from Dugan and at least one other person appeared on the document, along with Stefanini's signature at the bottom. In Stefanini's testimony, however, he resolutely declared that all employees at Montrose were hired on an at-will basis, and that his company has *never* offered an employment contract. (Tr. 97.) If this testimony is to be accepted, it seems highly unlikely that Stefanini would have personally signed off on a document purporting to be an employment contract. Because neither Wajda nor Stefanini believed the payroll form to represent a contract, there was clearly no meeting of the minds. Thus, it appears neither party provided evidence of a binding

*written* contract. Therefore, if there was a contract, it was most likely an *oral* agreement.

**{¶41}** While the Ohio Supreme Court deems it "preferable" to have a contract memorialized in writing, it has held that an oral agreement "may be enforceable if there is sufficient particularity to form a binding contract." *Kostelnik* at ¶16.

**{¶42}** As a general rule, however, employment under an oral agreement is presumptively at will. *Mers v. Dispatch Printing Co.* (1985), 19 Ohio St.3d 100, 104, 19 OBR 261, 438 N.E.2d 150. Either party may terminate the employment relationship at any time for any reason not contrary to law. *Mers* at 104, 19 OBR 261, 438 N.E.2d 150. In *Mers*, the Ohio Supreme Court recognized that the terms of an at-will employment relationship may be altered by implied or express contractual obligations. *Mers* at 104, 19 OBR 261, 438 N.E.2d 150. Here, although Montrose's policy handbook disclaimed that all employment was at will, Wajda maintained that his agreement with Dugan created an express contractual obligation that modified his employment status.

**{¶43}** To prove a breach of contract claim for either an express or an implied contract, the plaintiff must demonstrate: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff. *Gruger v. Diversified Air System, Inc.*, 7th Dist. No. 07 MA 52, 2008-Ohio-3403, at ¶42, citing *Doner v. Snapp* (1994), 98 Ohio App.3d 597, 600, 649 N.E.2d 42. Demonstrating the existence of both express and implied-in-fact contracts requires proving every element of a contract. *Dunn v. Bruzzese*, 172 Ohio App.3d 320, 2007-Ohio-3500, 874 N.E.2d 1221, at ¶28, citing *Lucas v. Costantini* (1983), 13 Ohio App.3d 367, 368, 469 N.E.2d 927. What distinguishes express contracts from implied-in-fact contracts is the *form* of proof that is necessary to establish each contractual element. *Dunn* at ¶28, citing *Penwell v. Amherst Hosp.* (1992), 84 Ohio App.3d 16, 21, 616 N.E.2d 254.

**{¶44}** In express contracts, assent to the terms of the contract is actually articulated in the form of an offer and an acceptance. *Dunn* at ¶28, citing *Lucas* at

368, 469 N.E.2d 927. On the other hand, in implied-in-fact contracts, "the parties' meeting of the minds is shown by the surrounding circumstances, including the conduct and declarations of the parties, that make it inferable that the contract exists as a matter of tacit understanding." *Dunn* at ¶28, quoting *Stepp v. Freeman* (1997), 119 Ohio App.3d 68, 74, 694 N.E.2d 510 (Citation omitted.). Therefore, to establish a contract implied in fact, "a plaintiff must demonstrate that the circumstances surrounding the parties' transaction make it reasonably certain that an agreement was intended." *Dunn* at ¶28, quoting *Stepp* at 74, 694 N.E.2d 510, citing *Lucas* at 368, 469 N.E.2d 927.

{¶45} Wajda's complaint seems to posit that a definite offer of employment was made, to which he clearly accepted. Wajda's testimony recounted the efforts of Dugan and Price to recruit him to Montrose. (Tr. 25-28.) Discussions extended over several weeks, during which the focus was primarily on compensation. Id. Wajda contended that he and Dugan eventually had a meeting in which the two negotiated a guaranteed starting rate of $4,500 per month for the first four months, with an increased commission percentage. (Tr. 28.) Wajda's position was essentially that this constituted an offer, and that he accepted it.

{¶46} Dugan confirmed that he actively sought out Wajda for employment at Montrose. (Depo. 4-5.) Dugan's testimony, however, was plagued by vague recollections. He repeatedly stated that Wajda had a guarantee, but Dugan could not recall any specifics of the agreement. (Depo. 5-8.) Further, he thought Price actually handled the negotiations – a statement both Wajda and Price refuted. (Depo. at 5-6; Tr. 14, 28.)

{¶47} Still, Dugan testified that he was charged with building a sales team, and that he routinely used guarantees as a method for securing desirable employees. (Depo. at 4-5, 10-11.) The guarantees Dugan would offer ranged from $4,000 to $8,000 for three to six months. (Depo. at 7-8.) Dugan considered Wajda to be an asset, and clearly evidenced his intention to persuade Wajda to leave his employment at Sweeney to work for Montrose. (Depo. at 4-5, 25.) The collective

testimony revealed that Dugan operated with very little oversight from upper management, and Dugan claimed that no one ever questioned any of his hiring decisions during his brief tenure at Montrose. (Depo. at 20-21; Tr. 91-92.) In addition, it appeared that no one other than Dugan and Wajda would have knowledge of the final negotiation wherein the agreement was supposedly reached.

{¶48} Furthermore, as the magistrate noted, it was unlikely that Wajda would leave Sweeney without an offer that was comparable or better from Montrose. Multiple persons testified to Wajda's success at Sweeney, and Wajda related his reluctance to jeopardize the financial stability of his family without the benefit of a preliminary guarantee. (Depo. at 4; Tr. 28.)

{¶49} Although Dugan's inability to recall any specifics of the offer is somewhat problematic, the law is clear that, in oral contracts, mutual assent may be manifested by means other than an explicit offer and acceptance. The terms of an oral contract may be determined from the "words, deeds, acts, and silence of the parties." *Kostelnik* at ¶16. "[S]eldom, if ever, does the evidence in proof of an oral contract present its terms in the exact words of offer and acceptance found in formal written contracts. And no such precision is required." *Rutledge v. Hoffman* (1947), 81 Ohio App. 85, 86, 36 O.O. 405, 75 N.E.2d 608.

{¶50} Accordingly, there was enough evidence to support the magistrate's decision that an oral contract existed. Although there was testimony rebutting the allegation that Wajda was offered a guarantee, none of it came from any person that actually participated in recruiting Wajda. Those individuals, therefore, would not have had firsthand knowledge of the negotiations. Dugan's testimony, though imprecise, made clear that he intended to bring Wajda and any other worthy candidate to Montrose on a guarantee of at least $4,000 per month for no less than three months. Dugan even made offers as high as $8,000 per month for six months. And no one from Montrose disputes Dugan's ability to make deals and hire employees on the company's behalf. Thus, Wajda's assertion that he was offered $4,500 per month for four months is well within reason, and evidences a meeting of the minds between the

parties.  Further, there was adequate consideration: the guarantee was to be paid for Wajda leaving his employment at Sweeney and working for Montrose.  And, believing Wajda's testimony, the essential terms were definite and certain.  Allowing deference to the magistrate's credibility judgments, there is certainly some competent, credible evidence going to the existence of either an express or implied oral agreement.

{¶51}  Having established that a contract existed, it is unnecessary to consider whether Montrose would be bound under a theory of implied-in-law contract or promissory estoppel.  Thus, we shall examine the other elements of Wajda's breach of contract claim.

{¶52}  Wajda had been performing per the terms of his agreement with Dugan up until his termination from Montrose.  Wajda never missed a scheduled day of work. (Tr. 57.)  Price attested to Wajda's work ethic and initiative. (Tr. 20.)  Wajda had been making sales, although those numbers were admittedly below his performance at Sweeney. (Tr. 44, 56.)  However, Wajda's contract with Dugan did not include any provision for a minimum sales quota.  In fact, the agreement was made with the expectation that Wajda's sales would be off his previous mark. (Tr. 26.)  The guarantee essentially offset any lag in sales while Wajda developed a customer base.  Moreover, there was testimony that sales were down throughout the dealership. (Tr. 26.)

{¶53}  Montrose contends that Wajda was not entitled to the entire judgment since he did not work for the entire four-month period.  According to Montrose, the lower court's judgment implies that "Wajda could have worked one day and then quit and nevertheless been entitled to $18,000." (Brief of Appellant at 5.)  This is an overstatement.  Wajda, of course, was still required to substantially perform.  Montrose's decision to prematurely terminate Wajda's employment cannot be held against him.  Although another individual had contacted Wajda about an employment opportunity, Wajda testified that he was still ready, willing, and able to fulfill his contractual obligation. (Tr. 35.)  And as this court has held, a party who prevents performance on the part of the adverse party "cannot take advantage of such non-

compliance or non-performance by the party obligated to perform under the contract." *Gary Crim, Inc. v. Rios* (1996), 114 Ohio App.3d 433, 436, 683 N.E.2d 378, citing *Suter v. Farmers' Fertilizer Co.* (1919), 100 Ohio St. 403, 126 N.E. 304. Therefore, Wajda substantially performed.

**{¶54}** The breach and resulting damage are self-evident: the parties stipulated that Wajda was paid $6,713.62; full payment of the guarantee would have been $18,000; thus, Montrose failed to pay Wajda $11,286.38. Since a contract existed for the guaranteed amount, the failure to pay that amount constituted a breach. Obviously, Wajda would be damaged by not receiving the balance of his guarantee.

**{¶55}** It is well established that a party proving breach of contract is entitled to the benefit of his or her bargain. *Schambach v. Afford-A-Pool & Spa*, 7th Dist. No. 08 BE 15, 2009-Ohio-6809, at ¶10, citing *Garofalo v. Chicago Title Ins. Co.* (1995), 104 Ohio App.3d 95, 108, 661 N.E.2d 218. In a breach of contract action, the award of money damages is designed to place an aggrieved party in the same position that he or she would have been had the contract not been breached. *Schambach* at ¶10, citing *World Metals, Inc. v. AGA Gas, Inc.* (2001), 142 Ohio App.3d 283, 287, 755 N.E.2d 434. Had Montrose not breached, Wajda would have received the full amount stipulated in the guarantee. Further, in order to set aside the trial court's damage award as against the manifest weight of the evidence, a reviewing court must determine that the award is "so disproportionate as to shock reasonable sensibilities." *Lydic v. Earnest*, 7th Dist. No. 02 CA 125, 2004-Ohio-3194, at ¶37, quoting *Bailey v. Allberry* (1993), 88 Ohio App.3d 432, 437, 624 N.E.2d 279. Rather than being disproportionate at all, the magistrate's damage award precisely conformed to the amount Wajda was contractually due.

**{¶56}** While the record contains inconsistent and contradictory testimony, it cannot be said that this is the exceptional case where the evidence weighs heavily against the judgment. While there was evidence to the contrary, there was at least some competent, credible evidence going to all the essential elements of Wajda's

claim.    Giving due deference to the trial court's ability to make credibility determinations that cannot be gleaned from the written record, we cannot find that the trier of fact clearly lost its way.    As such, the lower court's adoption of the magistrate's decision was based on sufficient evidence and does not go against the manifest weight of the evidence.

**{¶57}**  Accordingly, Montrose's assignments of error are without merit.

**{¶58}**  The judgment of the trial court is hereby affirmed.

Waite, J., concurs.

DeGenaro, J., concurs.